Ross TAYLOR, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 85-51.

Supreme Court of Wyoming.

Oct. 28, 1986 *.

Kevin P. Meenan, Casper, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Sylvia Lee Hackl (argued), Asst. Atty. Gen., Cheyenne, for appellee.

Before THOMAS, C.J., ROONEY **, BROWN and CARDINE, JJ., and RAPER, J., Retired.

CARDINE, Justice.

A jury found appellant Ross Taylor guilty of second degree sexual assault under § 6-2-303(a)(v), W.S.1977, and the district court sentenced him to a term of two to four years in the Wyoming State Penitentiary. The sentence was suspended, however, in favor of a six-month term in the Natrona County Jail and two years of probation.

Appellant contends that the three-year-old female victim, whose testimony was the only evidence supporting his conviction, should not have been permitted to testify because she was an incompetent witness. He also maintains that a videotaped interview of the child taken by police officers several days after the alleged crime should not have been admitted into evidence at trial because it was hearsay, violated his right of confrontation, and was more unfairly prejudicial than probative. While there may be a great deal of merit to these arguments, especially the contention that the videotape was substantially more unfairly prejudicial than probative, we do not base our reversal on them. We will reverse because the district court allowed the jury to view the testimonial videotape during deliberations without satisfying the requirements of § 1-11-209, W.S.1977, infra, and *Chambers v. State*, Wyo., 726 P.2d 1269 (1986).

The major participants in this case were the victim, the victim's parents, appellant, and appellant's wife, who was a sister of the victim's father. On March 4, 1984, the victim and her father went to appellant's house for dinner. After dinner, the victim's father and his sister, appellant's wife, decided to visit the victim's mother at the lounge where she was working that eve-

---

* Reassigned for opinion to Cardine, J., June 11, 1986.

** Retired November 30, 1985.

ning. Appellant stayed home to take care of his five children and the victim. He put his children to bed at 8:00 p.m. and stayed up with the victim another hour watching television. He then decided to go to bed, and he took the victim with him. Appellant testified that they watched some more television from the bed and that the victim soon fell asleep. According to appellant, he then got up, checked the other children, returned to bed and slept until morning.

The victim's father and appellant's wife left the lounge about 10:00 p.m. and returned to appellant's house. Appellant's wife went to the bedroom where both appellant and the victim were sleeping. The victim was on top of the covers fully clothed. Appellant's wife picked her up and carried her to the living room. The victim's father then took her home and put her to bed. The victim's father testified that the child never woke up during this entire procedure. The victim's mother said that her daughter did wake up but admitted that the child did not say anything of any consequence before her father put her to bed.

At about 9:30 the next morning the victim came into the kitchen where her mother was cooking breakfast, said her wee-wee was hurting her, pointed between her legs, and said that appellant had sucked on her. The victim's mother called her husband, who was at work, and he contacted the Natrona County Department of Social Services. That afternoon the parents took the victim to her regular pediatrician for tests, but he could find no evidence of abuse.

On March 7, 1984, the victim's parents took her to the Social Services office where they met Sergeant Judi Cashel of the Casper Police Department, and social worker Eva Inman. Officer Cashel gave the child two anatomically correct dolls which represented appellant and the victim. The victim used the dolls to show the investigators and her parents what appellant had done. The interview was recorded on an audio tape which was not played for the jury at trial.

The next day, the victim's parents took her back to the Department of Social Services for a videotaping session. The parents waited in another room while Officer Cashel, Ms. Inman, and a cameraman conducted the interview. There is no need to give a complete description of the entire twelve-minute session but a few salient features are worth noting. First, at the beginning of the session, the three-year-old child had difficulty showing that she knew the difference between fantasy and reality. Second, Officer Cashel's questions were often extremely suggestive. Third, the camera was positioned so that it could capture both Officer Cashel and Ms. Inman as they sat on the floor with the victim. But Officer Cashel faced away from the camera during much of the interview making it difficult to see her motions and facial expressions made to the victim. The cameraman did not always move the camera to follow the action. Several important demonstrations by the victim using the dolls occurred off camera, leaving the viewer with only a suggestion of what was happening. Finally, it must be noted that a blank videotape was not used to record the interview. Another interview, with another child about another sexual assault involving another defendant, was recorded on the same tape; and only a four-second gap separated the two interviews. The record does not show whether the jury saw any or all of this entirely unrelated recording during deliberations; but, if part of it was shown, the jurors could easily have been inflamed by what they saw. The little girl who was interviewed in the unrelated videotaping session had obviously suffered severe psychological damage at the hands of her adult abuser.

We do not decide whether these deficiencies in the videotape would be sufficient for reversal. We note, however, that some trial circumstances might warrant use of the tape even with its technical problems. Other circumstances might mandate exclusion. These decisions are best left to the discretion of the trial judge. We mention the deficiencies in the tape in an effort to be helpful; it is important that use of mod-

ern technology be accompanied by technical skill.

At trial, the prosecution offered the videotape into evidence during the testimony of Officer Cashel, the first witness. The court withheld its ruling, however, pending further foundational testimony. That foundation was established to the satisfaction of the court by the testimony of the second witness, the victim. The videotape was played for the jury despite defense counsel's objections that it was hearsay and more unfairly prejudicial than probative, that it contained the testimony of an incompetent witness, and that it was supported by an inadequate foundation.

Immediately following the playing of the videotape, the prosecutor asked defense counsel to stipulate that the tape was an exhibit which would automatically be admitted to the jury during deliberations. Defense counsel would not so stipulate, and the court ruled that it would allow the jurors to view the tape during deliberations only if they asked for it. The trial continued for another day and a half during which the victim's parents, appellant's wife, and several character witnesses testified. Appellant also took the stand and denied that he had any sexual contact with the victim. Closing arguments ended at 2:15 p.m. on September 12, and the jury began deliberations at that time.

An hour into deliberations the jury sent a message to the court to request another viewing of the videotape. Defense counsel renewed the objections he raised at trial and added that a second viewing would be prejudicial because it would emphasize the videotaped testimony over other testimony that the jurors could not take with them. The court overruled the objection and allowed the jury to view the videotape. The court's only act of supervision over the viewing was its request that the prosecutor recommend someone to operate the monitor. Defense counsel had no objection to the person chosen by the prosecutor. At 11:15 p.m., about eight hours after the videotape was shown in the jury room, the jury returned with its guilty verdict.

In *Chambers v. State*, supra, 726 P.2d at 1277, we held that

"a testimonial videotape may never go to the jury for unsupervised viewing during deliberations. In rare circumstances the court may respond to a jury's request by showing portions of a testimonial videotape during an interruption in the deliberations. Under § 1–11–209, W.S.1977, the court must ascertain exactly why the jury wants to view the videotape, must decide whether the tape will give the jury key facts without unduly emphasizing a witness' testimony, and must only show the relevant portions under carefully controlled procedures. It is suggested that the kind of request § 1–11–209, supra, contemplates might be an inquiry concerning a witness' testimony as to the width of a street, height of an object, distance, time or some other limited request but not the entire testimony of the witness."

Almost all of these requirements were violated in this case. The court did not supervise the viewing, an error that could have had devastating consequences if the jury was mistakenly permitted to see the portion of the videotape which showed the entirely unrelated testimony of the traumatized victim of the other sexual assault. There was no inquiry as to why the jurors wanted to see the tape nor any determination of specific facts sought by the jury. Instead of exercising its discretion, the court decided early in the trial that the entire videotape would be given to the jury if it was requested. As we stated in *Chambers v. State*, supra, 726 P.2d at 1276,

"[e]ven with the best of procedures, it would not be proper under [§ 1–11–209, W.S.1977] for the court to reread a transcript or replay a videotape of a witness' entire story just because the jury wants to review all of the testimonial matter that happens to be available * * *."

Under the circumstances, these errors cannot be considered harmless. The case was obviously very close. The jury deliberated for nine hours before it reached its

verdict. The only evidence supporting that verdict was the victim's testimony which the jury heard twice during the trial and again during deliberations. On the other hand, the contradictory testimony of the only other eyewitness, appellant, was heard by the jury just one time at trial. It is probable that the jury gave undue emphasis to the victim's videotaped testimony. For all of the reasons stated, having found prejudicial error, we must reverse and remand for a new trial.

Reversed and remanded.

THOMAS, Chief Justice, dissenting with whom RAPER, Justice, Retired, joins.

I would affirm Taylor's conviction. the views that I have expressed in my dissenting opinion in the case of *Chambers v. State*, Wyo., 726 P.2d 1269 (1986), I adopt in this case. Reiteration is as unnecessary as the reversal of Taylor's conviction.