Michael E. STONE, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–292.

Supreme Court of Wyoming.

Nov. 25, 1987.

Wyoming Public Defender Program: Julie D. Naylor, Appellate Counsel, Cheyenne, for appellant (defendant).

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Asst. Atty. Gen., Cheyenne, for appellee (plaintiff).

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Chief Justice.

On May 19, 1985, appellant Michael E. Stone shot and killed his mother. He was convicted of first degree murder and sentenced to life imprisonment.

On appeal appellant raises five issues:

## I

"Was it error to refuse to suppress statements made by Appellant?

## II

"Was it error to allow a tape recorded statement of the Appellant to be replayed by the jury during deliberation?

## III

"Was it error to refuse to allow the defense's expert witness to remain in the courtroom during the testimony of the State's expert witness?

## IV

"Was there sufficient evidence of malice to support the verdict of the first degree murder?

## V

"Was it error to refuse to give two proposed jury instructions?"

We will affirm.

Appellant does not deny that he killed his mother, but rather contends that he is not guilty of a crime because of mental illness or deficiency.

Depravity abounded in the Stone home during appellant's childhood. He was sexually abused by both parents who were alcoholics. Appellant joined the Navy at age eighteen. During his military career, he developed a drinking problem that led to

some disciplinary measures against him. After spending time in a Navy rehabilitation center, appellant became involved in helping other alcoholics. Ironically, he eventually became director of a program for alcoholics in the Navy. Appellant retired in 1984, returning to Lovell to live with his widowed mother, Marie Stone. Marie Stone still had a drinking problem, but up until the week of her death had been talked out of abusing alcohol by appellant.

At the time of the homicide, appellant was forty-one years old and had been living with his mother for a year and three months. Marie Stone began drinking again in mid-May. Appellant's drinking also escalated at that time.

At about 11:30 p.m., May 18, 1985, appellant went to the home of William Cameron about a block from his mother's house. Both appellant and Cameron had been drinking heavily during the evening of the 18th and the early hours of the 19th, and appellant was intoxicated when he arrived at Cameron's house. Cameron and appellant talked about Marie Stone with appellant saying of his mother, "She's drinking too much lately. She's becoming a pain in the butt" and a burden. The two men then talked about ways to kill people (no one in particular); and they talked about "piano wire around the neck, suffocation and self-induced drowning." Appellant said that these methods of killing were "too messy, too ugly," and then said, "Well, why can't you just shoot them? How about a bullet in the heart or something?" Appellant left the Cameron home about 1:30 the morning of May 19th saying he "had business to go take care of." He also said, "Well, I'm going to go waste her." Cameron replied, "God, Mike, don't you hurt that little old lady. Don't you do it."

Cameron watched appellant drive into his driveway and turn off his vehicle lights. Shortly after appellant arrived home, Cameron called him on the telephone. Cameron inquired, "Is everything okay?" Appellant said, "It is now."

About 2:00 a.m. appellant came back to the Cameron house, entered through the back door and fell against the wall crying. Cameron said, "What's the matter, Mike?" Appellant said, "I wasted her * * * I just killed my frigging mother." Appellant repeated this latter statement a few moments later and produced a gun. Conversation about the gun and the shooting lasted about thirty minutes, interrupted from time to time while Cameron and appellant took another drink. Cameron became greatly concerned when appellant handed him a pen knife and said, "Here, just in case she ain't dead, would you go check and maybe cut her throat or something and take her out of her misery."

Cameron hastened to the Stone house. His description of the living room scene was, "I seen Marie sprawled out on the couch, one arm hanging down here off to the side, and blood all over." Cameron immediately called the police.

At trial, appellant described the killing: " * * * I remember getting the gun and I remember shooting her. I remember missing once, and I remember stepping into the kitchen, leaning back against the kitchen table with the gun in my right hand, and I put both my hands out like this on the table, and I knocked over a bottle—a half-pint of something. And I remember opening it and drinking it all. I remember stepping back into the living room, and I asked, 'Are you in any pain?' And I remember her saying, 'Don't worry about it, Mike. There is a God. They're coming for me.' And then I remember shooting her two or three more times. And then I left."

After the shooting, appellant was tested for alcohol. His blood alcohol level was 0.15 and the urine test was 0.20. There was also evidence that appellant had ingested some Librium at some time before the shooting, and that Librium, when taken with alcohol, has the effect of increasing the effect of intoxication. According to the Chief of Police, David Wilcock, the blood test for drugs was negative.

After a preliminary hearing appellant pled not guilty and not guilty by reason of mental deficiency. Before trial, appellant was given a forensic evaluation at the Wyo-

ming State Hospital. He was found to be "competent to proceed to trial." He was also found to be "sane under Wyoming Statute 7–11–303." A designated examiner of appellant's choosing also found:

"The defendant, Michael Stone, is not mentally ill or deficient under the Wyoming's statutes. He was not mentally ill or deficient at the time of the alleged criminal conduct. He is presently able to cooperate with defense as to any available defense and maybe interposed on his behalf. The defendant does not need to be held in a designated facility."

The district court allowed appellant to obtain a third forensic evaluation. In a report, this examining doctor stated:

"In my opinion, at the time of the alleged crime, the defendant, as a result of mental illness and deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law."

At trial, the doctors making the pretrial mental evaluation testified. A special verdict was submitted to the jury and the jury did not find the appellant "not guilty by reason of mental illness or deficiency," but found him guilty of murder in the first degree.

## I

In his first assignment of error, appellant complains that the district court improperly refused to suppress certain statements made by him during post-arrest questioning. Before trial, appellant filed a motion to suppress evidence. The motion dealt with statements made by him to various law enforcement officers and alleged violations of his rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. The motion also was grounded on the absence of a truly informed and voluntary waiver of constitutional rights. The motion was granted in part and denied in part. It was granted as to statements made during booking procedures at the Big Horn County Jail, but was denied as to taped statements made to Chief Wilcock and investigating Officer James Moan. It, too, was

denied subject to further clarification as to statements made by appellant to Officer Craig Moore while being transported to Lander, Wyoming.

Appellant argues that he did not voluntarily waive his right to silence, or his right to consult with an attorney before questioning, because he was too intoxicated to do so. The two statements which appellant argues were not voluntary were taped statements given to Chief Wilcock at 7:04 a.m. on the day of the shooting and the statement given to Officer Moan at 4:20 p.m. that same day. It is not disputed that appellant was read his constitutional rights before making these statements, but rather whether or not he voluntarily and intelligently waived those rights. The state does not deny that appellant ingested alcohol before, at the time of and after the shooting.

The rather lengthy suppression hearing, which resulted in admission of the challenged statements, involved six state witnesses and two witnesses for appellant. Those witnesses were aware that at the time of appellant's arrest, he experienced a certain degree of intoxication. As described above, appellant's blood alcohol level at about 7:50 the morning of the shooting was at or between 0.15 and 0.20. Appellant was not questioned before 7:04 a.m. on the 19th of May because Chief Wilcock believed him to be too intoxicated. At the time of appellant's questioning, a slight odor of alcohol was detected. According to the Chief appellant answered questions intelligently and his speech was not slurred. He did not appear to be intoxicated. Appellant did not stagger, stumble or fall and walked without assistance. The Chief said he would not have questioned appellant if he had been significantly intoxicated.

The tape recording of appellant's statements was played to the court during the hearing, and the Chief explained that the alleged slurred speech was the result of a cigarette in appellant's mouth, a dry mouth, and being very emotional.

Officer Moan interviewed appellant between 4:00 p.m. and 4:30 p.m. the afternoon of the shooting. According to Moan, appel-

lant was coherent, seemed very normal and did not appear to be intoxicated and his speech was not slurred. Other testimony produced at the suppression hearing provided only minimal support for appellant's contention that he did not voluntarily waive his right to silence because of intoxication. He apparently relies on his blood alcohol level test and his urine test to support his contention of intoxication.

It would be improper for the trial court to rely exclusively on blood alcohol level or the results of a urine test to determine the voluntariness of a statement. The voluntariness of a confession is a question to be determined by considering the facts of each case. *Jahnke v. State*, Wyo., 692 P.2d 911, 923 (1984). The test of admissibility is whether under the totality of circumstances the waiver is voluntarily, knowingly and intelligently given. *Mayer v. State*, Wyo., 618 P.2d 127, 128 (1980).

In *Mayer v. State*, supra, the defendant made a statement to the police. He later attempted to have the statement suppressed asserting that he "was seventeen years of age, intoxicated, was suffering from physical injuries incurred from a severe beating, was emotionally overwrought and had been deprived of the counsel of his mother." We affirmed the trial court's finding that the statement was voluntary:

"* * * An examination of the cases cited by appellant in support of his argument reflects the circumstances in each are far more aggravated and severe than those in this case. The trial court relied upon the factual situation as presented to it by the evidence, and it considered the totality of the circumstances surrounding the transaction. Such evidence is gauged against such standard supports the findings of the trial court. [Citations.]" *Id.* at 130.

The circumstances in this case were not as aggravated as in the cases cited in *Mayer v. State*, supra.[1]

Other courts have also adhered to a rule that intoxication from drugs or alcohol does not per se establish involuntariness. *State v. Baker*, 4 Kan.App.2d 340, 606 P.2d 120, 123 (1980); and *State v. Tucker*, 32 Wash.App. 83, 645 P.2d 711, 713 (1982). Instead, for intoxication to render a confession involuntary, the impairment must be so great as to deprive an individual of a capacity to understand the meaning of his statements. See *Lee v. State*, Okla. Crim., 700 P.2d 1017, 1020 (1985). Even though a defendant appears intoxicated, the fact that he understood what he was doing, carried on a conversation and responded to questions will render the statements admissible. *State v. Curry*, 127 Ariz.App. 1, 617 P.2d 785, 787 (1980). The proper inquiry regarding intoxication is whether a confession cannot be said to be the product of rational intellect and free will because of extreme intoxication. *State v. Corona*, 60 Ore.App. 500, 655 P.2d 216, 219–220 (1982).

In *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 446, 88 L.Ed.2d 405 (1985), the United States Supreme Court determined that voluntariness of a confession is not an issue of fact presumed correct in a federal habeas corpus proceeding, but is a legal question meriting independent consideration. In analyzing the case here we have adhered to the principles of *Miller v. Fenton*, supra.

The trial court made a factual determination and legal conclusion that under the totality of the circumstances, appellant's statements were given voluntarily and were not rendered inadmissible because of intoxication. We hold that the trial court properly admitted the statements of appellant into evidence.

## II

In the state's case in chief, the tape recording of appellant's statement made to Chief Wilcock was played to the jury. During deliberations, the jury requested the use of a tape recorder, apparently to play the taped statement. The court inquired if

---

1. For example, *Mayer* cited *Lonquest v. State*, Wyo., 495 P.2d 575 (1972), where we held that the defendant's confession was properly admit- ted in spite of his blood-alcohol content being extremely high (0.3743). (374.3 mg. percent or 0.3743 percent blood alcohol)

appellant's counsel had any objection to furnishing a tape recorder. Defense counsel stated no objections, and the tape recorder was furnished to the jury. Appellant contends it was plain error to allow the jury to play the taped statement during deliberations.

 Rule 49(b), Wyoming Rules of Criminal Procedure, provides "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error, appellant must show a violation of a clear and unequivocal rule of law in the record, and that he has been materially prejudiced by that violation. *Brown v. State*, Wyo., 736 P.2d 1110, 1115 (1987).

In support of his contention that it was error to allow the jury to play the tape, appellant relies on *Taylor v. State*, Wyo., 727 P.2d 274 (1986); *Chambers v. State*, Wyo., 726 P.2d 1269 (1986); *Schmunk v. State*, Wyo., 714 P.2d 724 (1986). In each of these cases, we determined that under the relevant circumstances, it was error to permit the jury to view a video tape during deliberations; and we disapproved the unrestricted viewing of video tapes during jury deliberations. However, we have never ruled that video tapes may not be viewed under any circumstances by the jury during deliberations.

This case, of course, concerns an audio tape rather than a video tape, and perhaps the reasons for limiting its use are less compelling.[2] *Taylor*, *Chambers* and *Schmunk* can be distinguished from this case in several ways. We are concerned with a taped confession rather than the testimony of a victim or a nonconfessional interview with an accused. We note that:

"* * * [T]here is no rule of exclusion for tangible exhibits with verbal content. Nontestimonial exhibits with such content, such as contract documents or recordings of criminal acts which are verbal in nature, are generally allowed to go

into the deliberations. Indeed, it would be highly peculiar to withhold such things from the jury's scrutiny, and somewhat inconsistent with the whole philosophy underlying the Best Evidence Rule, which is embodied in modified form in Article X. And even exhibits which contain verbal summary of testimony may be taken by the jury: *Confessions by the accused are one example*, and there are many others." 3 Louisell and Mueller, Federal Evidence, § 390, p. 684 (1979). (Emphasis added.)

Other courts have supported the view that it is not improper for the court to permit documents or tape recordings containing confessions or incriminating admissions to be taken into the jury room in a criminal case. Annotation: *Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to be Taken into Jury Room in Criminal Case*, 37 A.L.R.3d 238, (1971).

 As a general rule, discretion lies with the trial court whether or not exhibits go with the jury. There is no reason why tape recordings should be exempt under all circumstances. *United States v. Samples*, 713 F.2d 298, 303 (7th Cir.1983). In Samples, the court held that it was not error to allow a taped confession to go into the jury room. In *Hampton v. State*, Alaska, 569 P.2d 138, 146 (1977), the Alaska Supreme Court stated:

"As mentioned previously, Hampton also contends that the superior court erred in permitting the taped confession to go to the jury room. The general rule is that it is within the sound discretion of the trial court whether to allow the jury to take a taped confession with them into the jury room once the confession has been admitted into evidence. Section 5.1 of the ABA Standards Relating to Trial by Jury (Approved Draft 1968) allows confessions to be taken to the jury room in the trial court's discretion. In the context of this litigation we cannot say

---

**2.** "Videotape testimony is unique. It enables the jury to observe the demeanor and to hear the testimony of the witness. It serves as a functional equivalent of a live witness." *Cham-*

*bers v. State*, Wyo., 726 P.2d 1269, 1275 (1986), quoting *Schmunk v. State*, Wyo., 714 P.2d 724, 733 (1986).

that the superior court abused its discretion in permitting the taped confession to go to the jury room."

*Taylor, Chambers* and *Schmunk,* all involved situations where the evidence of culpability was minimal. In *Taylor* the only evidence supporting the verdict was the victim's testimony which was heard by the jury twice during trial and again during deliberations. In *Chambers* the conviction was based on testimony of the five-year old victim. In *Schmunk* the video tape contained inadmissible evidence of Schmunk's refusal to submit to a lie detector test and a reference to inadmissible previous "bad acts." In this case, the killing is not disputed, and evidence of appellant's culpability is overwhelming.

In closing argument to the jury, counsel for appellant referred to the taped confession. He referred to outrageous things said by appellant, and to inconsistencies. These references could have been viewed by the jury as support for appellant's contention that he was disoriented and did not know what he was doing or what he had done. Furthermore, some of the taped statements made by appellant could reasonably support his defense that he suffered mental illness or deficiency. After the jury heard the tape played in open court, appellant's counsel stated at least twice during appellant's in-court testimony that the jury was going to take that tape and be able to listen to it. After being told that they were going to take the tape and be able to listen to it, we wonder what the jury would have read into a refusal after they asked for the tape recorder.

Appellant has fallen far short of demonstrating that he is entitled to invoke the plain error doctrine. He has not shown a violation of a clear and unequivocal rule of law or that he was materially prejudiced. Under these circumstances, the trial court did not abuse its discretion in allowing the jury access to a tape recorder.

### III

Appellant's third issue deals with the exclusion of one of his witnesses under a trial court order that witnesses not testifying be excluded from the courtroom during trial.

In support of his defense of not guilty by reason of mental illness or deficiency, appellant called Dr. Bernice Elkin. Before the state's rebuttal witnesses were called, defense counsel requested that Dr. Elkin be allowed to be present inside the courtroom while the state's experts testified. The court denied this request. Defense counsel was granted a recess, lasting almost two hours. When Dr. Elkin was recalled for rebuttal, she testified that it would have been helpful for her to be in the courtroom during the testimony of the state's experts. Appellant now alleges prejudicial error in the court's refusal to allow Dr. Elkin to be present during the testimony of the state's expert witnesses.

Rule 615, Wyoming Rules of Evidence, provides:

"At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may [make] the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause."

In *United States v. Agnes,* 753 F.2d 293, 307 (3rd Cir.1985), the court stated:

"We hold that the district court did not abuse its discretion in refusing to exempt [the witness] from the sequestration order. The defendant failed to demonstrate that [the witness'] presence at trial was essential to the presentation of the defense, as is necessary for an exemption under Rule 615(3). * * *"'

Rule 615, Federal Rules of Evidence is identical to Rule 615, W.R.E., except for the typographical omission noted in the Wyoming rule. A party who contends that the presence of a witness is essential to the presentation of his cause must bear the burden of supporting that allegation and showing why the policy of Rule 615 in

favor of sequestration is inapplicable. *U.S. v. Agnes*, supra at 306.

Here, appellant has made no showing that the presence of Dr. Elkin in the courtroom was "essential to the presentation of his cause." It was merely indicated that her presence would have been helpful. The trial court did not abuse its discretion in excluding Dr. Elkin from the courtroom.

### IV

Appellant next contends there was insufficient evidence of malice to support the verdict of first degree murder. In the court's instruction to the jury, malice was defined as:

> " * * * [T]he commission of a wrongful act done intentionally without legal justification or excuse. The term 'malice' conveys the meaning of hatred, ill will, or hostility toward another and implies a wicked condition of mind."

This instruction is substantially the same as that contained in Wyoming Pattern Jury Instructions–Criminal, § 7.106.

During deliberations, the jury sent a note to the court stating they were having trouble with the "definition of malice" and the word "excuse." The court asked the jury for further clarification of their question and received a communication, "[i]s there a legal excuse which will exclude malice?" The court answered the jury as follows, "[y]es, there are many, such as accident, self-defense, defense of another person, and mental illness. This list is not meant to be exhaustive."

Before the supplementary instruction was sent to the jury, defense counsel suggested that the court add to the list "drunkenness" or "intoxication." Counsel argued about this additional language, but the court declined to add the language. Defense counsel did not specifically object to, or approve of, the supplementary instruction.

The trial court does not like to decline to answer questions asked by the jury. Giving additional instructions after deliberations have begun, however, is not without risk. Usually a question asked is covered by instructions first given, and giving an additional instruction tends to emphasize the later instruction. Giving a single additional instruction may not be sufficient or may suggest to the jury other questions. A question asked by the jury may be irrelevant or otherwise inappropriate. Receiving this type of inquiry might suggest to counsel and the court that the jury does not understand the issues or theories of the case. In that event, there is the temptation to try to determine what the jury does not understand and try to supplement or clarify. Lastly, hurriedly fashioning an instruction while the jury is waiting to resume the trial is undesirable.

 In this case the initial question asked by the jury was equivocal and the clarification given by the trial court did not help much. Under these circumstances, it could be speculated that the jury required other instructions or reference to given instructions on specific and general intent, the elements of first and second degree murder, or how intoxication impacted on specific and general intent. In any event, we cannot see how the additional instruction given by the court prejudiced appellant in the possible area of jury concern. The instructions first given were adequate. First degree murder is a specific intent crime which can be negated by intoxication. Second degree murder is a general intent crime in which intoxication is not a defense. *Crozier v. State*, Wyo., 723 P.2d 42, 56 (1986). The court did not commit reversible error in giving the jury the additional instruction in the form in which it was given.

 The thrust of appellant's fourth assignment of error is that there was a complete lack of evidence of malice. We disagree. We rarely see a case in which malice is demonstrated by a single act or statement. Our rule on sufficiency of the evidence is well known:

> " 'The standard of review with respect to the sufficiency of evidence when that challenge is raised in a criminal case is "[T]his court is to examine all the evidence in the light most favorable to the state to determine if there is sufficient

evidence to uphold the verdict. [Citations.]'" *Capshaw v. State*, Wyo., 737 P.2d 740, 744 (1987), quoting *Dangel v. State*, Wyo., 724 P.2d 1145, 1148 (1986).

In this case there are many significant factors and permissible inferences from which the jury could determine that appellant exhibited malice when he killed his mother. Shortly before the killing, appellant and Mr. Cameron discussed various ways to kill people. Appellant stated, "How about a bullet in the heart or something?" Shortly after the shooting, appellant said, "I wasted my mother." He also said at least twice, "I just killed my frigging mother." Additionally, he handed his friend a knife and said, "* * * just in case she ain't dead, would you go check and maybe cut her throat or something * * *." We have held several times that malice may be inferred from the use of a deadly weapon in a dangerous and deadly manner and from all the other facts and circumstances. *Cutbirth v. State*, Wyo., 663 P.2d 888 (1983); *Leitel v. State*, Wyo., 579 P.2d 421 (1978); *Smith v. State*, Wyo., 564 P.2d 1194 (1977).

Sufficient evidence and permissible inferences exist from which the jury could find beyond a reasonable doubt that appellant, purposely and with malice, killed his mother.

## V

■ Appellant's final argument is that it was error to refuse two proposed instructions. One of the state's proposed instructions, stipulated to by the defense, was No. 23:

"In determining the weight to be given to an opinion expressed by any witness who did not testify as an expert witness, you should consider his credibility, the extent of his opportunity to perceive the matters upon which his opinion is based and the reasons, if any, given for it. You are not required to accept such an opinion but should give it the weight to which you find it entitled."

The court declined to give the instruction stating that other instructions were adequate.

Appellant contends that there was lay testimony concerning appellant's insanity and that his proposed instruction No. 23 should have been given. Appellant brings to our attention a statement made by one of his witnesses, Sandy Folkerts, to an investigating officer. The statement with respect to appellant was, "I believe I said something like, 'He must have gone insane.'" At trial, referring to appellant shortly after the shooting, Bill Cameron said, "* * * I just accepted it as Mike was just wacky * * * wacked out or spaced out, he * * * had his head so screwed up. * * * *"

In his objection to the court's refusal to give Instruction No. 23, appellant refers only to the so-called lay testimony of Bill Cameron. The statements of Folkerts and Cameron, insofar as they are opinions concerning appellant's mental illness or deficiency, are, at best, off the top-of-the-head statements giving a possible explanation of appellant's bizarre actions and state of intoxication. By no stretch of the imagination can they be considered opinions regarding mental illness or deficiency.

We are reminded of *Baird v. New York Cent. & H.R.R. Co.*, 16 A.D. 490, 44 N.Y.S. 926 (1897), in which there was an attempt to prove mental deficiency by testimony that a person was called "Crazy." The appellate court gave short shrift to this kind of testimony and held that the fact that a person is nicknamed "Crazy" is not evidence that he is a lunatic.

Rule 701, W.R.E. provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

The testimony of Folkerts and Cameron falls far short of lay opinion contemplated by Rule 701, W.R.E.

Appellant was not prejudiced by the court's ruling on the instruction. In Instruction No. 12, the court instructed the

jury that, "In deciding the issue of mental responsibility, you should consider all of the evidence. * * * " In closing argument, counsel for appellant was not prohibited from using the statements of Folkerts and Cameron in connection with the court's Instruction No. 12. These statements, however, do not have the dignity of an opinion regarding mental illness or deficiency.

Appellant also alleges error because his proposed instruction on heat of passion was refused. Instruction Y reads as follows:

"The sudden heat of passion contemplated by the voluntary manslaughter statute is descriptive of just such a state of mind, and it may occur from any emotional excitement of such intensity that it temporarily obscures reason, or leaves the mind bereft of reason."

This proposed instruction was extracted from language in *State v. Helton*, 73 Wyo. 92, 276 P.2d 434, 442 (1954). The court determined that the language from Helton contained in appellant's proposed instruction was not appropriate under the circumstances of this case; and in any event, the definition of heat of passion was essentially covered in the court's instruction No. 9:

" 'Heat of passion' means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question, which would cause him to act rashly, without reflection and deliberation, and from passion rather than from judgment."

■ Appellant did not object to the court's refusal to give his proposed instruction "Y" unless it may be said that offering an instruction amounts to an objection if the instruction is not given. That is not the law.

"* * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection * * *." Rule 51, Wyoming Rules of Civil Procedure.

■ Since there was not an objection to the refusal to give the requested instruction, any error must be considered under the plain error doctrine. It is obvious in this case that appellant has not shown a violation of a clear and unequivocal rule of law nor that he has been materially prejudiced. *Brown v. State*, supra, at 1115. "Heat of Passion" was adequately covered by the instructions given. The court did not abuse its discretion in refusing to give appellant's proposed Instruction Y.

We have carefully considered the five issues raised on appeal and find no reversible error.

Affirmed.

URBIGKIT, Justice, dissenting.

I dissent.

This case in the horror of its facts of heritage calls for us to "walk along a dark way." Not only was tragedy portrayed in social depravity and unadjusted criminality experienced by appellant in his youth, but now is reinforced by the life sentence at public cost, and his infinite loss. Unquestionably, the Furies will have their vengeance.[1] Since horror and tragedy are not rules, principles, or standards in our criminal-justice system, this case, as should each criminal appeal, must be reviewed within other more specified criteria. I find fault with the multiple utilization of the tape-recorded investigatory confessions as constituting trial error justifying reversal, and consequently dissent.

1. In the trial of Orestes in the Aeschylus drama, *Eumenides,* Orestes, with Athena defending, was tried for killing his mother. An exceptionally interesting and thoughtful analysis of ancient Greek mythological justice in relevance to contemporary criminal philosophy is found in the current article, Luban, *Some Greek Trials: Order and Justice in Homer, Hesiod, Aeschylus and Plato,* 54 Tenn.L.Rev. 279 (1987). Although the

Furies' "private vengeance" perhaps has been minimally moderated in current judicial systems, I doubt that the grotto to which they would have been restrained by continued asylum really is now to be found. What is justice, or something different that may only be vengeance, remains the eclectic quandary in our society within what is generously called the justice-delivery system.

Initially, both on a procedural basis and lack of rational differentiation where jury-deliberation availability of exhibits should apply alike to civil as well as criminal proceedings, a protective approach available for uniform application should exist. The multiplied involvement of video and audio tape evidence in the jury-trial process, raising questions of the reemphasized showing by introduction to the jury-room deliberations, is measured by the increased number of such cases now to be found. See Annot., 37 A.L.R.3d 238. In Wyoming, address of the general question specifically relating to audio tapes includes *Taylor v. State*, Wyo., 727 P.2d 274 (1986); *Chambers v. State*, Wyo., 726 P.2d 1269 (1986); and *Schmunk v. State*, Wyo., 714 P.2d 724 (1986).

At least in the plain-error context with which we are faced in this case, see *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981), I would not find precedence, logic, or a reasoned justice system to deny discretionary capacity to the trial court to find cause and to permit *reasonable* deliberative time for replay of audio and video evidence in the right case and under the right circumstances. Except under the particular factors of an individual case, no discernable difference between the "confession" and other "persuasive evidence" can be found.

The reason for dissent is the way that the evidentiary material was made available here clearly inviting prejudice to the defendant. There is no justification for unlimited access and consequent uncontrolled exposure. In this case, it is hard to imagine how many times portions of the tape recording may have been replayed for analysis and emphasis among the jury members.

Thoughtful consideration among the more discerning jurisdictions has been given to this concern even where precedence has generally permitted jury deliberation-time replay. Actually, my present concern is not unnoticed by this court, since in Chambers the procedure was approved as "carefully controlled." *Chambers v. State*, supra, 726 P.2d at 1275. In *Franklin v. State*, 74 Wis.2d 717, 247 N.W.2d 721 (1976), cited for authority in *Chambers* by this court, a persuasive arrangement was designed:

"We are of the opinion that the proper practice and procedure is that the trial court retain control of the jury's exposure to confessions. If during the course of its deliberations the jury requests to hear a recorded confession replayed or a written confession reread, it is within the trial court's discretion to grant such request. * * * The jury should then return to the courtroom, and the confession should be read to or played for the jury there." 247 N.W.2d at 725.

Differing from the basis of decision in *Chambers*, I find the *procedure* used in this case for replay to have created the prejudicial error. Whether or not the tape should have been played at all will not be further discussed, since address can only be made as plain error, which, in itself, for a proper one-time exposure, might not be found under these circumstances. Generally, reemphasized exposure of the jury to particularly prejudicial evidence by re-running or re-showing requires justification in fact for proper exercise of judicial discretion. Conversely, it is clearly appropriate for the court to deny re-exposure. *Short v. Spring Creek Ranch, Inc.*, Wyo., 731 P.2d 1195 (1987).

Additionally, I differ from the court's conclusion in application of discretion to deny a right of appellant's expert witness to remain in the courtroom to hear testimony of the State's comparable expert. On occasion, there may be justification for denial in exercised discretion, but this was not such a case. In ruling, the trial court stated:

"Well, the Court's in a fairly difficult position here. I believe that the rules contemplate that an expert may stay in the courtroom in spite of the sequestration rule under appropriate circumstances, and probably would have allowed the State's expert psychiatrist to be in the courtroom during Dr. Elkin's testimony if it had been requested. Now, we do have the, quote, fairness, end quote,

problem. We will have another problem. I don't know that the jury—I think the jury might question, and it might cause confusion in the jury's mind about having one witness in the courtroom when all of the rest of the witnesses have been excluded with the exception of Wilcock, and I don't know how the jury would construe that or could possibly construe that. The request will be denied."

I do not find action or inaction of opposing counsel in the adjudicatory process to be a suitable determinate of "fairness" as a basis for denial to requesting counsel, as here occurred. The essential nature of the witness for defendant as facing an admitted murder charge was obvious. Perhaps counsel could have pursued the request more diligently, but long experience in trial activities teaches that over-diligent pursuit on contested court decisions has an unacceptable trial price in undesired court response. To reverse what is frequently said in affirming appellate cases, the cold, printed page does not realistically communicate what the trial court in person discerns: it does not reveal the practical drama as the trial advocate relates to and is perceived not only by the trial judge but by the jurors. "Methinks thou dost protest too much" has a real and dangerous attribute in trial conduct.

I posture a second reason why a murder-case psychiatric witness should not be subjected to the same exclusion action as is the witness whose testimony is not similarly based on individual character. The communicative factors available to the forensic psychiatrist or psychologist should not be denied by removal from the courtroom, both in relation to the defendant, and, more particularly, by analysis of the comparable opposing testimony of other expert witnesses. Perhaps the denial is not raised to the level of reversible error in this case, but surely it was wrong to deny the request. The lack of certainty and absolutism in psychiatric testimony calls for as much exposure to fact and conflicting analysis as is possible, in that "as much as

possible" contact and observation can hardly be enough for the most reliable psychiatric opinion.[2]

I respectfully dissent.

---

**2.** It may not inure to the cognitive power of appellate adjudication, but I have unsettling concern that society having failed Michael E. Stone once in his youth, does yet again fail him in this process by the life sentence here applied.