**Bill C. STEPHENS, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 86–241.

Supreme Court of Wyoming.

May 3, 1989.

David A. Hampton, Honaker & Hampton, Rock Springs, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Asst. Atty. Gen., for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Retired.

THOMAS, Justice.

The significant question that we address in this case is whether expert opinion as to the guilt of the defendant can be admitted at a trial of a charge of sexual abuse of a child. Other issues are presented with respect to admissible testimony including whether, in such a case, an expert witness should be permitted to state that he believes the victim and whether witnesses should be permitted to testify about the statements of the victim. In addition, error is asserted by claims that the trial court abused its discretion in finding the victim competent to testify and that it improperly refused to permit the jury, in the course of its deliberations, to listen to an audiotape of an interview with the victim. We also note a concern about improper cross-examination of the defendant followed by an improper closing argument that had the effect of impermissibly shifting the burden of proof. We reverse this conviction because the expert witnesses, in effect, stated opinions as to the guilt of the defendant, and one of them vouched for the truthfulness of the victim. We address the other claims of error and our independent concerns because of the possibility of potential reoccurrence at a new trial.

Bill C. Stephens appeals from a conviction of taking immoral or indecent liberties with a child in violation of § 14–3–105, W.S. 1977. That statute provides:

"Any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony, and upon conviction shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years, or both."

The victim of Stephens' conduct was his minor son.

In the original Brief of Appellant, Stephens presented the following issues:

"1. Did the trial court err when it issued a blanket denial to the jury, denying the jury's request that they be allowed to listen to the original tape recording of the D–PASS interview of the child during deliberations?

"2. Did the trial court err in allowing psychologists to testify regarding hearsay statements of the child?

"3. Did the trial court err in allowing the child's grandfather to testify concerning hearsay statements made by the child?

"4. Did the trial court abuse its discretion by allowing the child to testify for the reason that the trial court failed to establish the competency of this witness?"

The State, in its brief, responded with this version of the same issues:

"I. Whether the trial court abused its discretion by refusing to allow the jury to listen to a taped interview with the victim during deliberations.

"II. Whether the trial court properly allowed two psychologists to testify to statements made by the victim and his grandmother.

"III. Whether the trial court properly allowed testimony of the victim's grandfather concerning an incident involving the victim.

"IV. Whether the trial court properly established the competency of the victim to testify."

After hearing oral argument and reviewing the briefs and the record, the court ordered rebriefing of certain issues to address the possibility of significant errors that had not been addressed in the original briefs. The matters concerning which the court requested briefing were:

"1. Did the trial court err in permitting testimony by expert witnesses setting forth opinions as to whether the victim had been sexually assaulted and further opinions as to the identity of the perpetrator?

"2. Did the trial court err in permitting testimony by an expert witness that the witness believed the victim?"

"3. Did plain error occur in permitting interrogation of the defendant as to what he had done to prove that he was not the perpetrator, followed by argument that suggested an obligation on the part of the defendant to prove that he was not the perpetrator?"

We note the objection of the State to the court's order with respect to additional briefing of issues not raised by the appellant. The State contends that this is contrary to the court's rule as a neutral and detached judicial body. We are sensitive to the proposition that judicial restraint generally demands that we address only those issues properly before us and preserved for our review. We also know that it is within our jurisdiction to decide any case as justice may demand. *White v. Fisher*, 689 P.2d 102 (Wyo.1984); *Allen v. Allen*, 550 P.2d 1137 (Wyo.1976). In addition, recent experience with post-conviction remedies teaches us that the failure of counsel to raise issues which implicate constitutional rights of a defendant in an appeal will result in those issues being presented in a subsequent proceeding under a claim of ineffective assistance of counsel. Consequently, judicial efficiency strongly suggests the treatment of obvious matters in the first appeal. We also have in mind the pertinency to the State of Wyoming of this statement by the Supreme Court of the United States:

" * * * Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'" *Brady v. State of Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).

It is not without regret that the court reverses Stephens' conviction. The record discloses a strong case against him. The state presented the testimony of Stephens' ex-wife, the mother of the victim, who reported pertinent information about Stephens and some specific information involving the victim. There was testimony of witnesses who participated in an investigatory interview of the victim jointly conducted by the Department of Public Assistance and Social Services (D–PASS) and the Sexual Assault Task Force. A pediatrician testified about his evaluation of the victim and provided information concerning pedophilia. The victim's grandparents reported their observations of the victim, and several expert witnesses testified about their evaluations, including the conclusions they reached as to the existence of sexual abuse

and, in some instances, the treatment of the victim. The little boy himself testified. In the defense case, a physician testified that he had treated the victim about twelve times for various conditions and had neither observed nor heard anything that might cause him to suspect sexual abuse. The defense called a psychologist who had examined the victim, and he was critical of the interviewing techniques and suggestive questioning of the victim. That witness, however, agreed that he thought the victim had been sexually abused and that, if he were accepting him as a patient, he would begin with that premise. Stephens himself testified and denied any misconduct.

There indeed is potential for a proper foundation which would justify the introduction of the expert testimony concerning the behavior of child victims of sexual abuse, the observations made of this particular victim including those items that brought him within the pattern of child victims of sexual abuse, and even the statements, accusatory in nature, of the victim made to the expert witnesses. The problem of pedophilia is sufficiently abhorrent to those who are not afflicted with such aberrant behavior that it is necessary to have experts explain this phenomena to those who sit in judgment in order for them to overcome their inherent rejection of such situations and to deal with the reality of the information being presented. Our analysis of those concerns will follow the discussion of the testimony which we hold went beyond proper limits.

As the record discloses, expert witnesses were permitted, in one way or another, to attribute guilt to Stephens. Perhaps the prosecuting attorney perceived this to be the frosting on the cake. Unfortunately, only the taste buds of the one who partakes can know whether they respond to the frosting, or to the cake. That, like the response of a member of the jury, is incalculably subjective. Consequently, if the frosting is bad, the morsel may not stay down even though the cake was sufficient to the need. In this instance, it is impossible to know whether one, or more, or all of the jurors may have responded to the testimony of the expert witnesses attributing guilt to Stephens. If that did occur, however, it would be the ultimate abdication of the function of the jury. We are compelled to reverse a case in which such testimony was admitted.

■ The expert witnesses included a pediatrician who had examined and treated cases of child sexual abuse and who had testified as an expert on the subject in several trials. He described some symptoms, both physical and behavioral, that, in his opinion, are commonly displayed by child victims of sexual abuse. The symptoms that he related included an unusual awareness of specific sexual acts, such as oral copulation, bed-wetting, changes in moods, and nightmares. This victim displayed all of these symptoms described by the witness. The doctor advised the jury that statistically eighty to eighty-five percent of child sexual abuse is committed by a relative close to the child. No objection was made to this testimony and, although one court has found error in the admission of such testimony, *State v. Petrich*, 101 Wash.2d 566, 683 P.2d 173 (1984), we do not perceive that testimony to be plain error. It is difficult, however, to understand how statistical information would assist a trier of fact in reaching a determination as to guilt in an individual case and, had an objection been made, it should have been sustained.

This witness testified that he had examined the victim twice at the request of the child protection team. Those examinations did not disclose any physical signs of sexual abuse except a slight looseness and redness of the victim's anal opening, which did not cause the witness a high level of concern, but did induce him to ask, "did anybody or anything cause that * * *?" The defense objected, but the witness was permitted to repeat the response made by the victim: "Daddy cut my butt and made it bleed and it hurt." The witness also was permitted to testify that the victim told him, "T peed on me while I was in the shower," and that he saw Stephens remove the clothes from one of his female playmates. The doctor explained that these later events may not have occurred in actu-

ality and, if the stories were not true—although he did not observe any indicators that would cause him to suspect that the victim fabricated his stories—the likelihood was that the victim had used a defense mechanism of "transference" in an attempt to identify his experiences with those of his playmates. T and the playmate both testified later for the defense and denied that either of these events occurred. This witness also discussed pedophilia and testified that it is possible for it to be in a regressive state but then activated by the absence of a sexual outlet.

Into this general expert setting which had been prefaced by the testimony of Stephens' ex-wife, and had been followed by the testimony of a police officer concerning an interview of the victim that had been audiotaped, the testimony of a school counselor and a private therapist, who held a master's degree in guidance and counseling, then was added. This witness explained that she had attended several seminars on child sexual abuse, and she testified that the victim was referred to her by the Sexual Assault Task Force. That referral included advice that it was believed that the victim had been sexually abused by his father before he had gone to live with his grandparents, a product of the parents' separation. The witness described the therapy process and, in the course of that testimony, repeated several statements the victim had made to her, which indicated that Stephens had sexually abused him. The witness also repeated a statement made by the victim to his grandmother, which the grandmother had reported to the therapist during the course of treatment. That report was that the victim had been experiencing nightmares and, one night, when the grandmother heard him screaming, she went into his room and found him "standing up in bed screaming and pointing to his butt saying, 'Don't let daddy hurt me.'" Defense counsel objected to this testimony contending that the grandmother's statement was hearsay and requested the answer be stricken. The court ruled that the witness could testify only as to what the grandmother had observed.

In completing his direct examination, the prosecuting attorney then asked:

> "Based on your sessions with [the victim] and your experience and training as a therapist, and your training in working with children who have been the victims of sexual abuse, do you have an opinion as to whether or not [the victim] has been the victim of sexual abuse?"

Defense counsel objected to this question, asserting lack of foundation, but the trial court ruled that the witness' opinion was admissible under Rule 704, W.R.E. The witness then stated: "I believe [the victim] has been abused." The prosecutor pressed on, asking, "Based on your sessions with him and talking to him, do you have an opinion as to who the perpetrator is?" Again, defense counsel objected, but the judge permitted the answer which was, "Based on the fact that I have seen him for a year-and-a-half and that he has not changed who has done it to him, I would say that it was his father, Bill."

Another expert witness testified. She reported that she had a bachelor's degree in social work and also said that she had supplemented her education by attending several workshops on sexual assault and interviewing techniques, including the interviewing of family members in an incestuous relationship. She was an employee of D-PASS and, in that capacity, was requested to assist in the initial interview of the victim, which was conducted by a female member of the Sexual Assault Task Force, to determine if he had been sexually abused. The witness described the interview procedure that followed, which included the use of anatomically correct dolls. This testimony essentially was the same as that of the police officer who had testified earlier. On re-direct examination, the prosecuting attorney inquired if the witness had reached any conclusions as a product of that interview. The witness replied that, on the basis of what the victim had reported during the interview, she was in accord with the others that the case should be referred to the county attorney. The next question was, "And do you have an opinion based on that interview as to

whether or not [the victim] was sexually abused?" Objection again was made because of no foundation, but the prosecuting attorney argued that he was trying to clarify the basis for the recommendation. The court ruled that the witness could answer, and the answer was, "I believe that he was sexually assaulted by his father."

Then, a licensed clinical social worker who was a marriage and family counselor and a psychotherapist testified. He stated that his field of practice was limited exclusively to sexual abuse. He said that he had evaluated [the victim] at the request of the county attorney. He described the victim's interactions with some anatomically correct dolls that included several verbal statements indicating Stephens had sexually assaulted the victim. Again, before completing direct examination, the prosecuting attorney asked, "Based upon your experience and training and your evaluation of [the victim], do you have an opinion about young [the victim]." Again, an objection was interjected, but the court permitted this answer: "It is my opinion that this child has been sexually abused by an adult. And it's been oral. He has been involved orally with his mouth on an adult male penis. And it appears to me that he has also had oral sex performed on him. And I believe that there is a possible anal attempt, either digitally or some other way." Then, the prosecuting attorney asked, "Do you have an opinion about who this contact has been with?" The witness responded, "He shares with me that it was daddy Bill." In this instance, the prosecutor went still further and asked, "Do you believe [the victim]?", and the witness replied, "Yes."

▮ The discovery by the court of this testimony in the record suggested obvious error in its admission into evidence. We then ordered rebriefing on that issue to determine whether any argument or authority was available that would justify such testimony. The State has not directed our attention to any pertinent authority, or presented any cogent argument, to support the decision of the trial court permitting these expert witnesses to state, in substance or directly, that, in the opinion of the witness, the victim had been sexually assaulted by Stephens. Our investigation of the law persuades us that no sound justification can be identified for permitting opinion testimony that, in substance, amounts to an opinion that the defendant is guilty. The only way that such testimony assists the jury is to encourage the abdication of its responsibility in favor of the testifying experts. That is not the style of assistance contemplated by Rule 702, W.R. E.[1]

We recognize that Rule 704, W.R.E.,[2] is designed to permit opinion evidence upon an ultimate issue. *McCabe v. R.A. Manning Construction Company*, 674 P.2d 699 (Wyo.1983). We have said that the effect of this rule is to abolish the "ultimate issue" objection. *Reed v. Hunter*, 663 P.2d 513 (Wyo.1983). The opinion, however, must still be evaluated in accordance with Rule 702.

Testimony as to guilt or innocence has not been discussed extensively. In 3 F. Wharton, Wharton's Criminal Evidence § 566 at 324, 325 (14th ed. 1987), the subject is addressed in this way:

"Ordinarily, the opinion of a lay or expert witness is not admissible if it amounts to a conclusion of law or a mixed conclusion of law and fact. Thus, a witness may not state his opinion as to * * * whether the defendant was guilty or innocent of the crime charged; * * *."

The only case cited in this treatise to support that proposition is *People v. Creegan*, 121 Cal. 554, 53 P. 1082 (1898), in which a

---

1. Rule 702, W.R.E., provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

2. Rule 704, W.R.E., provides:
 "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

rather cryptic reference is made to error in refusing to strike the testimony of a witness to the effect that he did not consider a participant to be guilty of a forgery. Perhaps this proposition is simply so inherently sensible that it never has received attention. In any event, we hold that permitting a witness, lay or expert, to articulate an opinion as to the guilt of the accused constitutes plain error and demands reversal. In arriving at this holding, we also note that the opinions were given without even the imposition of the standard (which mixes the law with the fact) that the jury was sworn to apply, deciding the existence of guilt beyond a reasonable doubt.

The particular inquiry must focus upon whether the expert testimony serves to assist the jury in resolving factual issues before it. Rule 702, W.R.E.; *Lessard v. State*, 719 P.2d 227 (Wyo.1986). While we noted in *Lessard* that the trial court is afforded great discretion in its decision as to what testimony will assist the jury, that discretion is not unlimited, and it does not justify the admission of testimony that will furnish no assistance to the jury. See *Zabel v. State*, 765 P.2d 357 (Wyo.1988) (the opinion testimony, although couched in the nomenclature of a psychologist, was little more than a statement to the jury that it was the impression of the expert witness that the victim was telling the truth). The testimony elicited in this case is much more troublesome than that presented in *Zabel*. In testifying for the prosecution, a counselor/therapist, a social worker, and a psychotherapist all were permitted, over objection, to testify that, not only did each have an opinion that the victim had been sexually abused but, in addition, that Stephens was the perpetrator. The essence of the record is that these opinions were based on their observations of the victim; what the victim had communicated to them; what others had told them about the victim; and their individual belief that the victim was telling

the truth. This testimony amounted, in substance, to an opinion that Stephens was guilty, although the witnesses were not asked to form an opinion based upon the appropriate legal standard. Such testimony cannot be perceived to address an area in which expert testimony provides assistance to the jury in resolving a factual issue. See *United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *Jennings v. State*, 289 Ark. 39, 709 S.W.2d 69 (1986). Instead, it must be recognized that the testimony could have decided the case for the jury. This testimony is not admissible pursuant to Rules 702 and 704, W.R.E., and the trial court not only abused its discretion, but committed clear error in admitting it.[3]

Even though error is found, it still is necessary, in most instances, to determine whether the error was prejudicial. *Zabel.* Unless the situation reaches the level of error per se, or is perceived to be constitutional error, error is prejudicial only if the defendant can establish a reasonable possibility that, in the absence of the error, the verdict might have been more favorable. *Zabel; Jones v. State*, 735 P.2d 699 (Wyo.1987). In assessing the impact of error, the strength of the case is an important factor. *Zabel.* In this case, like *Zabel*, there was no physical evidence and, to a substantial degree, the case hinged upon the credibility of reporting by the victim. In this regard, see *State v. Mueller*, 344 N.W.2d 262 (Iowa App.1983). The prosecuting attorney manifested his awareness that the experts' opinions would carry much weight with the jury, and he stressed the several opinions more than once in his closing argument. See *Gabrielson v. State*, 510 P.2d 534 (Wyo.1973); *Gibbons v. State*, 97 Nev. 299, 629 P.2d 1196 (1981) (prosecutor repeated the erroneously admitted testimony in closing). Compare *Jones* (error was not the subject of extensive inquiry by the prosecutor). This error

---

**3.** Having found error based upon a misapplication of the Wyoming Rules of Evidence, it is not necessary to consider constitutional implications. Nevertheless, we do note the potential invasion of the constitutional rights to a jury trial. Article 1, § 10, Constitution of the State of Wyoming; Amendments VI and XIV, Constitution of the United States. A clear delegation of the decision of the jury to the expert witnesses surely would deprive a defendant of his constitutional rights to a jury trial. An implicit delegation of that decision must have the same result.

probably was harmful according to the prejudice standard, but we already have recognized the impossibility of assessing whether the jury relied upon it in reaching its verdict. Consequently, we espouse the proposition that testimony offering an opinion as to the guilt of the defendant, when elicited by a prosecuting attorney, should be perceived as error per se.

■ In addition to resting our decision on the admission of the expert testimony with respect to guilt, we also note the error in permitting the psychotherapist to vouch for the truth of the victim who did testify. In accordance with our decisions, admitting that testimony also was error and would justify reversal. *Zabel,* 765 P.2d 357; *Lessard,* 719 P.2d 227. In *Lessard,* we held that the rule of *Smith v. State,* 564 P.2d 1194 (Wyo.1977), that an expert may not testify concerning the truthfulness of the defendant or a victim, survived the adoption of Rule 704, W.R.E. We held that the jurors are as qualified as expert witnesses to determine the credibility of any witness, and that testimony commenting on the credibility of a witness is not admissible under Rule 704. Accord, *Azure,* 801 F.2d 336. Even so, because the guiding criterion is what is helpful to the jury, we have permitted an expert witness to testify that the behavior of a victim was consistent with that generally displayed by victims of sexual assaults, even though such testimony does, in some way, validate the credibility of the victim. *Griego v. State,* 761 P.2d 973 (Wyo.1988); *Scadden v. State,* 732 P.2d 1036 (Wyo.1987); *Lessard.* Accord, *Stewart v. State,* 521 N.E.2d 675 (Ind. 1988). Cf. *Brown v. State,* 736 P.2d 1110 (Wyo.1987) (reaching the same result.)

■ Acknowledging the probability of a further trial, we deem it appropriate to address other issues raised in this appeal because those matters may reoccur upon retrial. Accord, *Azure.* We first consider expert opinion as to the fact of sexual abuse. In *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), reversible error was found in a social worker's testimony that, based on what the victim had reported to her, it was her opinion that the victim had

been sexually abused. The case was decided on an assumption that there may be cases in which a proper foundation would permit such testimony, but the court also stated that such opinion testimony is inadmissible as a matter of law on the ground that it invades the province of the jury. The concern about invasion of the province of the jury has been eliminated in Wyoming by the adoption of Rule 704, W.R.E.

The approach taken in *State v. Kim,* 64 Haw. 598, 645 P.2d 1330 (1982), is in harmony with Rule 704. The court there refused to apply a per se rule that would exclude all such expert testimony. The court concluded that the issue should be resolved in the context of each case, weighing the value of the testimony against any prejudicial effect. In that instance, since the expert's testimony was based on objective criteria, describing the similarities and behavioral characteristics of child victims of sexual abuse and comparing the pattern to the victim in the case, the court ruled that the testimony could assist the trier of fact. The court carefully distinguished testimony premised on objective information from testimony depending only on subjective impressions of what had been reported to the expert:

" * * * Had the statement presented not been adequately supported by comprehensible testimony which the jury could itself evaluate, or had the opinion not flowed inevitably from such testimony, Dr. Mann's statement most certainly should have been excluded since any use given the statement would have relied more on the witness' status than the testimony's substance." *Kim,* 645 P.2d at 1339.

The rationale of *Kim* is in accord with the language and philosophy of Rules 702 and 704, W.R.E. It is consistent with other cases. *United States v. St. Pierre,* 812 F.2d 417 (8th Cir.1987); *State v. Myers,* 359 N.W.2d 604 (Minn.1984). The expert's opinion is not to be excluded merely because it embraces an ultimate issue. Rule 704, W.R.E.; *McCabe,* 674 P.2d 699. It is only to be limited or excluded when it fails to assist the trier of fact in resolving some

issue. Rule 702, W.R.E.; *Lessard*, 719 P.2d 227. We have affirmed cases in which the expert testified that the behavior of the victim was consistent with that generally displayed by victims of sexual assaults. *Griego; Keller v. State*, 723 P.2d 1244 (Wyo.1986); *Scadden; Lessard.* Accord, *Stewart.* Cf. *Brown*, 736 P.2d 1110.

■ With respect to the claim that the district court erred in permitting the minor victim to testify, we note that the trial court did conduct a hearing in chambers, out of the presence of the jury, to determine whether the victim was competent to testify. The judge asked the victim several questions to determine if he was capable of discerning and relating the truth. The responses to those questions indicated that the victim knew the truth from a lie and that he could testify as to his recollections. Relying on those responses, the trial court ruled that the victim could testify. The objection of the defense counsel to that ruling was based upon the fact that the victim had discussed the events with so many adults that independent recall no longer could be assured, as required by *Larsen v. State*, 686 P.2d 583 (Wyo.1984). The victim then took the stand and testified that Stephens "cut me on the bottom, sucked my penis and bit me on the penis." The victim agreed that he had told the social worker who specialized in sexual abuse and the school counselor/therapist what had happened to him, and he stated that he told the counselor/therapist that Bill [Stephens] was a "liar" for saying that it did not happen. He also testified that he saw "Bill's penis" and that something "soft and gooey" came out of it. On cross-examination, the victim responded affirmatively to questions that suggested that his mother and his grandmother did not like Stephens and that his mother said "bad things" about Bill. He also testified that the counselor/therapist had told him that "Bill was a liar." Defense counsel asked the victim if he loved Bill, and the response was, "I used to love him but now I don't." He also said that he stopped loving Bill when he moved in with his grandparents. We perceive no merit in Stephens' contention that the victim was not competent to

testify. That competency was established in accordance with the standards articulated in *Smith v. State*, 714 P.2d 1201 (Wyo.1986), and *Larsen.*

■ Among the issues raised is Stephens' contention that the trial court erred in refusing to permit the jury to listen to the audiotape of the D–PASS interview during the course of its deliberations. The record establishes that the jury made a specific request to listen to the tape, which apparently had not been furnished with the other exhibits. The trial judge then called counsel into chambers, reported the request, and advised them of his proposed answer:

> "The jury has asked a question: 'We would like to listen to the tape of the original D–PASS interview.' And I propose to answer the question, because I think they're entitled to an answer, and the answer is this: 'We cannot permit you to hear the tape again as that would be placing undue emphasis on but one portion of the evidence. If we were to give you the tape, we would also have to give you a copy of the transcript of the entire trial, which is impossible, as it would take days to transcribe. You'll just have to rely on your memory of the tape, just as you'll have to do with all the rest of the evidence.'"

The defense counsel objected to the ruling, and the argument to this court is that the tape demonstrated that interview techniques which were used were so suggestive that any later diagnoses were unreliable; the purpose of the jury in asking for the tape was to consider that proposition; that, if the tape was non-testimonial, then the trial court abused its discretion because reviewing it was critical to the issue of the victim's credibility; and, alternatively, if the testimony was testimonial, the court failed to follow the procedure espoused in *Chambers v. State*, 726 P.2d 1269 (Wyo. 1986).

Stephens seems to urge that § 1–11–209, W.S.1977, creates an affirmative obligation on the part of the trial court to determine

the reason for the request of the jurors. Section 1–11–209 provides as follows:

"After the jurors have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where information upon the matter of law shall be given. The court may give its recollection as to the testimony on the points in dispute, in the presence of or after notice to the parties or their counsel."

In our judgment, Stephens misreads *Chambers* and the subsequent case of *Taylor v. State*, 727 P.2d 274 (Wyo.1986). The effect of those decisions was to hold that the trial court could permit a review by the jury of testimonial exhibits only if § 1–11–209 was followed:

"To summarize our holding, a testimonial videotape may never go to the jury for unsupervised viewing during deliberations. In rare circumstances the court may respond to a jury's request by showing portions of a testimonial videotape during an interruption in the deliberations. Under § 1–11–209, W.S.1977, the court must ascertain exactly why the jury wants to view the videotape, must decide whether the tape will give the jury key facts without unduly emphasizing a witness' testimony, and must only show the relevant portions under carefully controlled procedures." *Chambers*, 726 P.2d at 1276–1277.

These requirements should be followed if the trial court permits the jury to review testimonial evidence. If this audiotape is testimonial, it cannot be taken into the jury room, and the jury may be permitted review upon request only after compliance with the language quoted from *Chambers*. Even so, it is still the rule that a decision to refuse the request will be reversible only if " 'it is clear that an injustice had been done.' " *Short v. Spring Creek Ranch, Inc.*, 731 P.2d 1195, 1200 (Wyo.1987), quoting *Hoskins v. State*, 552 P.2d 342, reh. denied 553 P.2d 1390 (Wyo.1976), cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977), which cited *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, reh. denied [76 Wyo. 1] 300 P.2d 567 (1956), cert. denied 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957).

Furthermore, the rule in Wyoming is that any decision to permit non-testimonial exhibits to be taken into the jury room is within the sound discretion of the trial court. *Stone v. State*, 745 P.2d 1344 (Wyo. 1987). In this instance, the record does not demonstrate whether the trial court found the audiotape to be a testimonial exhibit. That is a threshold determination to be made by the trial court. See *Smethurst v. State*, 756 P.2d 196 (Wyo.1988); *Stone; Taylor*, 727 P.2d 274; *Chambers*, 726 P.2d 1269; *Schmunk v. State*, 714 P.2d 724 (Wyo.1986) (emphasizing the unique qualities of videotapes). If the court concludes that the audiotape is not testimonial, then it may permit the jury to have the tape in the course of its deliberations just as any other exhibit may be furnished to the jury. If, however, it is perceived as testimonial, then the approach described in Chambers must be pursued.

In this appeal, Stephens also asserts error in permitting the pediatrician, the counselor/therapist, and the psychotherapist to repeat statements made to them by the victim. These statements connoted that Stephens had sexually abused the victim. The State has argued that these statements were not hearsay because they were admitted to rebut a charge of recent fabrication or, alternatively, the State contends that, if they were hearsay, they were admitted as statements made for the purpose of diagnosis or treatment. Either of the justifications urged by the State requires a more considered approach on the part of the district court. Greater attention should be focused upon the proper foundation.

As to the contention that these statements were not hearsay because they were admissible to rebut a charge of recent fabrication, Rule 801(d)(1)(B), W.R.E., provides that among those statements which are not hearsay is one which is "consistent with his [the witness'] testimony and is offered to rebut an express or implied charge against him of recent fabrication or

improper influence or motive * * *." In order for the statement to be admitted under this rule, the declarant must testify, and there must exist an express or implied charge of recent fabrication or improper influence or motive. *Makinen v. State,* 737 P.2d 345 (Wyo.1987); *Chambers; Matter of GP,* 679 P.2d 976 (Wyo.1984); 4 D. Louisell & C. Mueller, Federal Evidence § 420 at 187 (1980). The State argues, without supporting authority, that the opening statements of defense counsel provided the implied charge of recent fabrication or improper influence or motive and this, without more, permits the admission of the statements under this rule. The argument fails to address the requirement that the declarant must testify before the prior consistent statement is offered. The proper interpretation appears to be that there is no charge of recent fabrication or improper motive or influence to rebut and no credibility to be restored by offering a prior consistent statement prior to the time that the declarant testifies, although preadmission may be justified as harmless error if the declarant does testify later in a manner that is consistent with a prior statement. *Nitz v. State,* 720 P.2d 55 (Alaska App.1986), aff'd. 745 P.2d 1379 (Alaska 1987), and cases cited therein at 720 P.2d 69–70. See also *Azure,* 801 F.2d 336. Before the declarant testifies, there is no way to determine whether the prior statement is consistent with testimony at trial. In those cases in which we have held a statement to rebut a charge of recent fabrication to be admissible, we have noted that the declarant had testified and had been cross-examined before the prior consistent statement was offered. *Makinen; Chambers; Matter of GP.*

We also note another concern present in the context of these statements. In *Chambers,* 726 P.2d at 1273, we said "[a] witness' prior consistent statements are not admissible under Rule 801(d)(1)(B), W.R.E., unless they were made before the alleged fabrication or improper influence." In some later cases, it appears that the court receded from this requirement without overruling *Chambers.* See *Baum v. State,* 745 P.2d 877 (Wyo.1987); *Makinen.* We held in

those cases that there was no requirement under the rule that the prior consistent statement precede the time when the improper influence or motive arose. In so holding, in *Makinen,* 737 P.2d at 349, we quoted from *United States v. Parodi,* 703 F.2d 768 (4th Cir.1983). The thrust of *Parodi* is that, if the prior consistent statement is used for purposes of rehabilitation and not as affirmative evidence, it is not required that the improper influence antedate the statement. *Chambers* can be reconciled with *Makinen* and *Baum* if the rationale of *Parodi* is followed. See *United States v. Harris,* 761 F.2d 394 (7th Cir. 1985); *Johnson v. State,* 730 P.2d 175 (Alaska App.1986); *Nitz.*

The concern encompassed in *Baum* and *Makinen* that it is sometimes difficult to establish when the improper influence or motive was introduced well may be alleviated if a procedure similar to that proposed in *Coleman v. State,* 741 P.2d 99 (Wyo. 1987), is followed. The proponent of the prior consistent statement should be prepared to demonstrate that the statement is in fact a prior consistent statement and should be prepared to identify the charge of recent fabrication or the charge of improper influence or motive which the statement is introduced to rebut. The proponent should also demonstrate whether the statement antedated or followed the time of the recent fabrication claim or the contention of improper influence or motive. "A demonstration on the record that this process has been pursued will provide a proper record from which this court may pursue the question of any abuse of discretion by the trial court in admitting such evidence." *Coleman,* 741 P.2d at 105.

Should the trial court find that the improper influence or motive or the claim of recent fabrication antedated the consistent statement, and yet still determine that the probative value justifies admission, a limiting instruction must be given, if requested, to the effect that the statement may be considered only for the limited purpose of evaluating the credibility of the declarant witness and that it should not be considered directly as proof of the matter

asserted. *Nitz*, 720 P.2d 55. See also *Parodi*, 703 F.2d 768. Compare *Matter of GP*, 679 P.2d 976, (prior consistent statement admissible as substantive evidence when the statement was made prior to the motive to fabricate).

█ It was Stephens' contention at trial that any statement made by the victim after the D–PASS interview was tainted by the procedure used; that the D–PASS interview was itself motivated by marital difficulty; and that the grandmother had told the victim to report that Stephens had sexually assaulted him in order to assure that Stephens would not obtain custody in a divorce proceeding. If the corrupting influence did in fact precede the statements, probative value is greatly diminished.

" * * * Evidence which merely shows that the witness said the same thing on other occasions when his motive was the same does not have much probative force 'for the reason that repetition does not imply veracity.' " 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(1)(B)[01] at 803–150 to –151 (1987), quoting *United States v. McPartlin*, 595 F.2d 1321, 1351 (7th Cir.1979), cert. denied 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

See also *State v. Stark*, 48 Wash.App. 245, 738 P.2d 684 (1987); *State v. Purdom*, 106 Wash.2d 745, 725 P.2d 622 (1986); *Nitz; Smith v. State*, 100 Nev. 471, 686 P.2d 247 (1984).

█ The trial court did not admit the statements as prior consistent statements in this case. They, therefore, must have been admitted as hearsay pursuant to one of the specific exceptions found in Rules 803 and 804, W.R.E. *Horton v. State*, 764 P.2d 674 (Wyo.1988); Rule 802, W.R.E. The trial court ruled that they were admissible pursuant to Rule 803(4), W.R.E., as statements made for purposes of medical diagnosis and treatment. The most troublesome statements are those that the victim reported to the pediatrician, the counselor/therapist, and the psychotherapist to the effect that Stephens had perpetrated sexual assaults upon him. Statements which attribute fault or causation generally are not relevant to diagnosis or treatment. *Horton; Goldade v. State*, 674 P.2d 721 (Wyo.1983), cert. denied 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984); *United States v. Iron Shell*, 633 F.2d 77, 55 A.L.R. Fed. 664 (8th Cir.1980), cert. denied 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). If a foundation is presented which establishes that the identity of the perpetrator was necessary for diagnosis or treatment, however, such a statement may be admitted under the rule. *Horton; Goldade; Iron Shell; United States v. Renville*, 779 F.2d 430 (8th Cir.1985); *State v. Maldonado*, 13 Conn.App. 368, 536 A.2d 600 (1988), certification denied 207 Conn. 808, 541 A.2d 1239 (1988); *People v. Wilkins*, 134 Mich.App. 39, 349 N.W.2d 815 (1984); *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985); *State v. Vosika*, 85 Or. App. 148, 735 P.2d 1273 (1987); *State v. Nelson*, 138 Wis.2d 418, 406 N.W.2d 385 (1987). The exception articulated in *Goldade* is based on the assumption that disclosure of the identity of the perpetrator satisfies the requirements of Rule 803(4), W.R.E., and thus encompasses the inherent reliability which justifies admission. A proper foundation is essential, however, and the simple fact that the statement was made to a doctor or other medical personnel during treatment does not justify admission. *Horton; People v. Galloway*, 726 P.2d 249 (Colo.App.1986); *State v. Mueller*, 344 N.W.2d 262 (Iowa App.1983); *State v. Burgess*, 465 A.2d 204 (R.I.1983).

█ The Eighth Circuit, applying Rule 803(4), F.R.E., which is identical to Rule 803(4), W.R.E., has set forth a two-part test to assure that such statements conform with the policy of the rule before they are admitted. That test is:

" * * * [F]irst the declarant's motive in making the statement must be consistent with the purposes of promoting treatment [or diagnosis]; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Renville*, 779 F.2d at 436.

See also *Iron Shell; Goldade; State v. Robinson*, 153 Ariz. 191, 735 P.2d 801

(1987); *Galloway; Vosika; Nelson.* The record presented in this case does not encompass the foundation which this rule suggests. Apparently, the trial court required only that the doctor, the counselor/therapist, and the psychotherapist were paid for their services and that they then were reporting statements made during the course of treatment. It is likely that each of them could have testified that the victim's statement was consistent with the purposes for which they became involved with the victim, and that they did rely upon those statements in connection with treatment or diagnosis. That foundation is the proper one to demonstrate that the statements were made under conditions permitting an assumption of reliability and to justify the admission of the statements pursuant to Rule 803(4), W.R.E.

 The victim's grandmother was not called as a witness until after the school counselor/therapist had testified. Her testimony encompassed the fact that, after the victim came to live with her and his grandfather, she became aware that the victim was experiencing nightmares of snakes and octopuses with dark hair and that she reported the nightmares to the counselor/therapist. She apparently was not asked to repeat the statement made by the victim which the grandmother then reported to the counselor/therapist. In his appeal, Stephens contends that the trial court erred in permitting the counselor/therapist to repeat the statements made by the grandmother concerning the nightmares. A statement need not be made to a physician, and statements made to hospital attendants, or even family members, may be admitted under Rule 803(4) if the foundation conditions are satisfied. *State v. Brubaker*, 184 Mont. 294, 602 P.2d 974 (1979); 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 803(4)[01] at 803–144 to –145; 4 D. Louisell & C. Mueller, Federal Evidence, § 444 at 608–609. Such statements are not required to refer to the declarant's physical condition. Statements made to close relatives, which then are reported to the doctor, may be admitted under the rule, although double or multiple hearsay may be presented. 4 J. Weinstein

& M. Berger, Weinstein's Evidence, ¶ 803(4)[01] at 803–145; 4 D. Louisell & C. Mueller, Federal Evidence, § 444 at 609. In this instance, the trial court ruled that the counselor/therapist could testify to any statements describing the victim's actions, but not to any statements as to what the victim had said. To the extent that the actions of the victim amounted to non-verbal expressions, which is Stephens' argument, the counselor/therapist could report statements made by the grandmother so long as they were reported for the purpose of providing treatment to the victim, and they were of the type reasonably relied upon by therapists in providing treatment.

Again, foundation should be the focus of the trial court's consideration. As we will note in treating with a further issue, the victim's statements to his grandmother, apparently the product of his dreams, well could constitute an excited utterance. It may be that a more definitive foundation would justify the report of those statements directly by the grandmother. With respect to the statements to the counselor/therapist by the grandmother, this record does not establish the reason that the statements were reported. One might assume that they were reported to assist in the victim's treatment, but there was evidence in the record which would suggest other motivations. Furthermore, the record does not demonstrate that the counselor/therapist reasonably relied on such statements for purposes of treatment of the victim. On retrial, the court should be satisfied that the proper foundation is established for these statements.

 The victim's grandfather reported an incident when the victim bit him in the area of his crotch while they were watching television. The grandfather stated that he had "jumped up and hollered at the victim saying 'you don't ever do that again;'" whereupon, the victim replied, "it's okay, my daddy lets me do that to him all the time." This statement was objected to as inadmissible hearsay, but the trial court ruled it was admissible as an excited utterance. In response to Stephens' arguments before this court, the State urges

that the "hollering" at the victim by the grandfather was the startling event. An event which would not be troublesome to an adult may be startling to a child. *State v. Padilla,* 110 Wis.2d 414, 329 N.W.2d 263 (1982). Even giving the rules of evidence a liberal construction, however, there was nothing in the record that would indicate that the victim appeared to be in a state of excitement as required by Rule 803(2), W.R.E., at the time he made his statement. The rule assumes the presence of a startling event which temporarily stills the senses and alleviates any motive to fabricate. *Horton,* 764 P.2d at 674. Absent a proper foundation demonstrating that the statement was made while the victim was in a sufficient state of excitement, the exception should not be invoked. *Horton.*

Some courts have held that even though a statement made by a child concerning a sexual assault was not admissible under any specific exception to the hearsay rule, it could be admitted under the so-called catch-all exception, Rule 803(24), W.R.E. E.g., *Robinson,* 735 P.2d 801; *Oldsen v. People,* 732 P.2d 1132 (Colo.1986); *State v. Smith,* 315 N.C. 76, 337 S.E.2d 833 (1985); *State v. Sorenson,* 143 Wis.2d 226, 421 N.W.2d 77 (1988). In this instance, the trial court did not rely on the catch-all rule and, because we reverse on other grounds, we do not have to justify its ruling pursuant to that rule. We already have suggested appropriate approaches to address admissibility of the several statements.

■ We must dispose of one final matter. When Stephens testified in this case, he denied any sexual abuse of the victim and explained some of his personal conduct which catered to an overactive libido by complaining of sexual difficulties with his wife. He denied any misconduct involving the children. He stated that he began to believe a divorce would be necessary because of his feelings for another woman, and he discussed the matter with his wife. That discussion was followed by marital counseling, but the wife did not cooperate. He also said that, when he told the grandmother that he would contest custody of the children, she replied that "she would

spend any amount of money to stop me." Stephens agreed with his ex-wife's earlier testimony that he was responsible for instructing the victim that men had penises and muscles, and women had breasts, which was consistent with terminology reported by the victim.

The problem developed during cross-examination. The prosecutor asked several questions which suggested an obligation on the part of Stephens to establish his innocence. An objection was made to the first question, accompanied by the argument that the matter was not relevant, but the record is silent as to further objections. An example of the questioning is:

"Explain what you have done since you knew your child has been molested, according to your own witness, a doctor, and according to the other knowledge that you had of this trial. And you had access to two separate investigators. Explain what you have done to find out who did it, if you didn't do it."

Then, in closing argument, the prosecutor emphasized the testimony of the experts including that of the expert called by Stephens, who reported his opinion that the victim had been sexually assaulted, and the admissions made by Stephens that he had made no effort to identify the guilty person. The prosecuting attorney first developed in closing argument the testimony of the experts contending that any issue of whether the victim had been sexually abused was no longer present in this way:

" * * * Because at the start of the trial, there were really two issues. Whether [the victim] had been victimized sexually and whether this man was responsible. By the time the State finished its case and the Defense presented its case and we got to Dr. Lindberg, even their own witness, saying that it did happen to [the victim].

"So, I would submit to you, ladies and gentlemen, at this point we're down to one issue. There's little or no doubt that it happened to [the victim]. Every witness, every expert, said it did. Even the person that they paid for, that they

brought down from Casper says that it did happen to [the victim].

"So, the thing that you've got to consider now is whether we've proven that Bill Stephens is the one responsible."

Then the prosecuting attorney argued that the evidence demonstrated that Stephens was the perpetrator in this language:

"But, perhaps the most damning things that implicated him as being responsible for this sexual abuse are two items. And I'd ask you to consider if you knew your four-year-old boy had been sexually abused because three separate experts had evaluated him and said he had been, even the person you hired, and you had access to two private investigators, wouldn't you be beating the bushes if you didn't do it to find out who did it? With those investigators and out looking by yourself to find out how it happened, who did it, and who was responsible for it. What did Bill Stephens say when I asked him about that? What did he do to tell the jury what he had done to try to find out who did it, if he didn't do it? He said all of his efforts, 'were concentrated on proving I didn't do it.' He didn't have to look to find out who did it because he knows who did it. And his efforts were concentrated on proving to you he didn't."

In rebuttal, the prosecuting attorney then said:

"I think that you should carefully consider [the counselor/therapist's] testimony. You've had an opportunity to hear her talk, to evaluate her experience. She gave you her credentials. And she has spent a year-and-a-half, thirty-nine sessions. She has a definite opinion that [the victim] has been abused by his father. And she gave you that opinion. And who else would—who would know better than the therapist who's been trained and who has spent not one hour or an hour-and-a-half, as Dr. Lindberg has spent, but thirty-nine sessions over a year and a half. And she has the definite opinion that [the victim] has been abused by his father."

The Stephens claim is that the cross-examination and the closing argument resulted in an assertion by the prosecutor that Stephens had a burden to prove his innocence. Several of the questions strongly suggest that proposition, and such questions are not permissible. It is basic criminal law that the burden of proof rests upon the state and never shifts. In *Clenin v. State*, 573 P.2d 844, 846 (Wyo.1978), we said:

"* * * [A]ny comment upon an accused's exercise of his right of silence, whether by interrogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction."

That statement was made in the context of defending the constitutional right to remain silent but, just as a prosecutor cannot deny to a defendant the constitutional right of silence through improper questioning, neither should he be permitted to inhibit the right to a presumption of innocence by questions and argument. This record could be perceived as one in which the prosecutor, with devastating effect, stripped Stephens of the presumption of innocence in the eyes of the jury. The error then was compounded by the improper argument. See *People v. Lopez*, 152 Ill.App.3d 667, 105 Ill.Dec. 577, 504 N.E.2d 862 (1987); *People v. Weinstein*, 35 Ill.2d 467, 220 N.E. 2d 432 (1966), aff'd, 46 Ill.2d 222, 263 N.E. 2d 62 (1970).

The record does not disclose any pertinent, timely objection to the questioning or the argument. We are not privy to the trial strategy that defense counsel may have been pursuing in failing to object. The trial court did give the correct instructions to the jury with respect to the burden of proof and advised the jury that arguments by counsel were not evidence. These instructions would not have the presumed effect of curing the prosecuting attorney's disregard of the presumption of innocence however. In *Hopkinson v. State*, 632 P.2d 79, 166 (Wyo.1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), we said:

"Prosecutors cannot and should not be muzzled. It must be kept in mind that

the prosecuting attorney is a representative of the State whose obligation is to govern impartially, whose aim is not that it win a case but that justice be done. It is his mission that guilt shall not escape or innocence suffer. He is duty bound to prosecute with earnestness and vigor. While he may strike hard blows, he is not free to strike foul ones."

We assume that this tactic will not again be invoked by the prosecutor upon retrial.

Because the expert witnesses were permitted to offer opinions amounting, in each instance, to an opinion that Stephens was guilty and, because one of them vouched for the credibility of the victim, we reverse Stephens' conviction under the doctrine of plain error. The other contentions and matter addressed in this opinion are intended to assist in a retrial of this case. The judgment and sentence is reversed, and the case is remanded for a new trial.

BROWN, J., Retired, filed a dissenting opinion.

BROWN, Justice, Retired, dissenting.

I am hard pressed to disagree with the logic employed by the majority in its analysis of the issues *it* raised in this case. My disagreement rather, is with the manner in which the issues resulting in a reversal were brought before the court.

After diligently studying this case for eight and one-half months, the court apparently had not found a way to reverse it on the issues raised by appellant. At this juncture, the court developed, completely on its own initiative, three reversible issues and asked for briefing on these new issues.[1]

Appellant was represented at trial and on appeal by competent counsel. Apparently, neither appellant nor his lawyer thought that appellant was prejudiced at trial; by the matters raised by this court. Only after appellant and his lawyer learned of the errors suggested by this court, did they think for the first time that these matters were prejudicial to appellant.

It should not be necessary to remind the majority that it is not an advocate; it should not take sides in a case, but rather, it should at all times be neutral and impartial. Here the majority has abrogated its traditional role and taken sides in this dispute. The majority has become de facto co-counsel for the defense, nay chief counsel, and deserves to be complimented for unusually fine and effective criminal defense advocacy. I do not recall another circumstance where this court has developed reversible issues completely on its own.

The majority worship daily at the shrines of the late United States Supreme Court Justice Oliver Wendell Holmes, Jr., and the late Chief Judge of the Second Circuit Court of Appeals, Learned Hand. Justice Holmes said:

At the present time in this country there is more danger that criminals will escape justice than that they will be subjected to tyranny.

*Kepner v. United States*, 195 U.S. 100, 134, 24 S.Ct. 797, 806, 49 L.Ed. 114, 126 (1904).

Judge Learned Hand said:

Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, the accused need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the mind of any one of the 12 jurors. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstruct, delay and defeat the prosecution of crime.

A number of errors were committed in the trial of this case. These errors have been identified by the majority. However, the evidence of appellant's guilt was so overwhelming that the errors were rendered harmless. It is inconceivable that

1. I have long since repented for my minor ministerial role in causing this briefing.

the jury would have acquitted appellant even if the trial errors had not occurred.

I would affirm.