In the Matter of the Workers' Compensation Claim of John H. TAFFNER, an Employee of the City of Buffalo.

STATE of Wyoming, ex rel., WYOMING WORKERS' COMPENSATION DIVISION, Appellant (Objector–Defendant),

v.

John H. TAFFNER, Appellee (Employee–Claimant).

No. 91–71.

Supreme Court of Wyoming.

Nov. 22, 1991.

Joseph B. Meyer, Atty. Gen., Joe MacGuire, Asst. Atty. Gen., for appellant.

Greg L. Goddard of Goddard, Perry & Vogal, Buffalo, for appellee.

Before URBIGKIT, C.J., THOMAS, CARDINE, and GOLDEN, JJ., and RAPER, J. (Retired).

RAPER, Justice, Retired.

This is an appeal by the Workers' Compensation Division (Division) from the order entered by the district judge which reversed the hearing examiner who held in favor of the Division and denied Workers' Compensation benefits to employee/appellee herein.

The Division sets out the issues to be:

1. Whether substantial evidence existed to support the administrative hearing officer's decision to deny the Workers' Compensation coverage to the employee-claimant.

2. Whether the appellee failed to prove each and every element necessary under W.S. § 27-14-603(b) for compensated benefits at the trial level.

3. Whether the district court erred as matter of law by accepting jurisdiction to hear the appeal after it was improperly filed and perfected by petitioner (employee-claimant).

Employee, as an issue, only states that: "The trial court correctly ruled in favor of the claimant."

However, in the body of his brief, employee states that this appeal primarily involves the issue: "Was there sufficient evidence of medical causation to enable the Claimant to be entitled to receive benefits?" We agree that this is the real issue to be determined by this court.

We will remand to the district court to follow the precedent hereinafter cited.

Employee, in his brief, has captured a correct reflection of the record, about which there is really no dispute. We will paraphrase it to fit this opinion.

Employee is a sixty-one-year-old male who, at the time of his heart attack, had worked for the Buffalo, Wyoming, Police Department for a period of thirty-seven years, including some twenty-five years as Chief of Police.

In late December of 1989, Buffalo received a substantial snowfall in excess of three feet, which remained on the city streets into March of 1990. On January 5, 1990, the residential streets remained clogged with heavy snow with only one lane of traffic open for travel and that lane was covered with a heavy layer of ice.

On the afternoon of January 5, 1990, employee was called upon to assist in the arrest of an extremely large and violent man who had been located in a residential area of Buffalo. As employee was responding to the location, his patrol car became stuck in the deep snow. Employee then proceeded on foot, in bitterly cold temperatures, to the location where another officer had the fugitive's vehicle stopped. At that point, the fugitive was placed under arrest and two other officers and employee attempted to remove the man from his vehicle. An extended struggle ensued in which glasses and watches were broken and there was a very physical confrontation. The fugitive was finally subdued and transported to jail while employee was left at the location to inventory the fugitive's vehicle. Employee subsequently returned to his vehicle and attempted to push it from the deep snow. He was unsuccessful in removing the vehicle from the snowbank and a wrecker had to be summoned to assist.

At that time, employee began experiencing chest pains, shortness of breath and general nausea. He completed his shift on that date but continued feeling ill. He was unable to lie in a prone position that evening because of the chest pains. These symptoms continued throughout the following week. Finally, on January 11, 1990, while on shift, he went to the emergency room at the hospital complaining of the same symptoms. The physicians at the Johnson County Hospital admitted him and began a series of tests. On the morning of January 12, 1990, while being tested on the treadmill, employee became extremely ill and it was determined that he was in fact suffering from a myocardial infarction. He was then medicated and placed on a life flight to Casper where he was received, treated, and underwent an angioplasty (balloon) procedure.

Employee's claim for worker's compensation benefits was duly filed and heard as a contested case before a hearing examiner. The hearing examiner, in an opinion letter attached as part of his order, found that employee had established by a preponderance of the evidence:

(1) That there was a direct causal connection between the condition under which the work was performed and the cardiac condition.

(2) The causative condition occurred during an actual period of employment stress clearly unusual to or abnormal for employees in that particular employment.

(3) That the acute symptoms of cardiac condition were currently manifested not less than four hours after the alleged causative exertion.

However, the hearing examiner ruled that employee had failed to meet his burden with respect to medical causation and, therefore, denied benefits. The trial court, on the other hand, determined that employee *had* met his burden with respect to medical causation and awarded benefits accordingly.

Wyo.Stat. § 27–14–603(b) (1991) provides:

(b) Benefits for employment-related coronary conditions except those directly and solely caused by an injury, are not payable unless the employee establishes by competent medical authority that:

(i) There is a direct causal connection between the condition under which the work was performed and the cardiac condition; and

(ii) The causative exertion occurs during the actual period of employment stress clearly unusual to or abnormal for employees in that particular employment, irrespective of whether the employment stress is unusual to or abnormal for the individual employee; and

(iii) The acute symptoms of the cardiac condition are clearly manifested not later than four (4) hours after the alleged causative exertion.

■ We are inclined to believe that the only issue is whether the medical testimony is adequate to establish direct causal connection between the work activity and the heart condition. Only one expert medical doctor, a board certified cardiologist, testified, so we must look to his testimony for the answer. *Matter of Injury to Taylor*, 718 P.2d 63 (Wyo.1986). *Taylor* sets out the rule to be that the causal connection is established if a medical expert testifies that it is more probable than not that the work exertion contributed in a material degree to the precipitation, aggravation, or acceleration of a myocardial infarction. In *Taylor*, the doctor testified that there was an equal possibility that either the work activity caused the heart condition or that there was no connection between the work and the heart condition. This court held that testimony was inadequate to meet the rule enunciated in *Taylor*.

■ We see the testimony somewhat differently in the case now before us. The cardiologist here did testify such connection to be the case with this employee. There are nuances to the rule.

The following testimony was developed:

Q. * * * [H]e said he noted * * * that he felt shortness of breath, a general nausea, subsequently started having chest pains, had to stay up that entire night in an upright position because whenever he laid down the chest pains bothered him too much, and that that continued for a period of time through January 11th, and on that date while he was on duty, again, the pains and the general feeling became so much that he checked himself into the emergency room, and he was admitted.

Now given all of those facts as I have given them, assuming that that is his testimony or will be his testimony, how do you interpret that with regard to his condition that he found himself in on January 12th?[1]

A. Well, I think we can say he very clearly developed an unstable angina picture and that appears to have started on the 5th of January. Unstable angina

---

1. The facts of employee's exertion were correctly stated as previously set out in this opinion.

meaning that it came on with either less activity, or minimal activity, or even at rest.

So, he has gone from, apparently, stating that he did not have any symptoms to now having pain much of the night following this exposure to a great deal of cold—you said he had to get his patrol car out of the snow and had to wrestle with an individual to incarcerate him.

So all of those factors were there and were an unusual stress for him, and then that night he has a great deal of discomfort which causes him to be up a great deal of the night, and throughout the week after that he remained having episodes of pain, and finally, he takes himself to the hospital a week later.

During that time, he has what looks like an unstable angina picture.

Q. Can we relate the one condition with the unusual series of circumstances at least as he has testified about them?

A. Well, we can now say that he has given us a history that after having gone through unusual activities for him he has now become unstable.

Q. So, based upon that, can we assume or can we connect the two based upon a reasonable medical certainty? Based on his history and the signs and symptoms as you found them, can we say that the two are, to a reasonable degree of medical certainty, related?

A. Well, Mr. Taffner clearly developed symptomatology following the episode of extreme exposure in the very deep snow that we all remember in this part of the state, and then following that, he had to help incarcerate somebody, and then, he had pain all night. Following that, he does develop an occlusion of the artery.

So, I think we can say that that artery—the instability of that artery appears to have developed at that point in time and progressed to the point that it occluded.

Later in the testimony of the cardiologist, this exchange took place:

A. I could not say that his extreme activity, at this time, physically made the crack in the plaque occur. I can conjecture that, because of what ultimately happened a week later, sometime around this time he did have his plaque become unstable, because of the symptomatology that persisted and seemed similar all of the way through to the point of myocardial infarction, that something made his plaque unstable at that time and, ultimately, the myocardial infarction a week later.

Q. I take it that's conjecture and speculation and not within a reasonable degree of medical probability?

A. *I think it is within a reasonable degree of medical probability that that occurred.* You know our medical probabilities are different than legal probabilities because we have to work back from the symptomatology. (Emphasis added.)

Here we have a man that did develop a myocardial infarction. The symptomatology was fairly consistent through the preceding week, and ultimately, the same symptoms were associated with the narrowing. In fact, that make[s] it fairly likely that he did become unstable the week preceding that.

Q. Let me ask it like this then, Doctor. Did the heart attack occur within four hours of the activity on January 5th, 1990?

A. The heart attack did not occur within four hours.

Q. Yes, sir.

A. But, the unstable angina appears to have occurred within four hours.

\* \* \* \* \* \*

Q. And, see, that's the difficulty I have with you saying or testifying within a reasonable degree of medical probability that the causative exertion on the 5th actually resulted in the heart attack.

A. What I said was that following that exertion, the gentleman did develop the unstable angina pectoris, utilizing the fact that the symptomatology was consistent up to the time of the myocardial infarction, including at the time of the myocardial infarction, and the fact that the chest pain was similar to what he had had a week before.

The cardiologist consistently stuck to his testimony that the stressful events created a condition called "unstable angina pectoris" which a week later resulted in a myocardial infarction (heart attack).

From the totality of the cardiologist's testimony here, it is gathered that "it is more probable than not that the work exertion or stress contributed in a material degree to the precipitation, aggravation or acceleration of a myocardial infarction." *Kaan v. State ex rel. Wyoming Workers' Compensation Division,* 689 P.2d 1387, 1389 (Wyo.1984) cited favorably in *Matter of Injury to Kemp,* 711 P.2d 1142 (Wyo. 1986).

■ One other question with respect to procedure should be mentioned before we close. The Division asserts the district court did not have jurisdiction to hear an appeal and relies on W.R.A.P. 12.06 which provides that "[t]he petition for review shall include a concise statement showing jurisdiction and venue and the specific ground or grounds upon which petitioner contends he is entitled to relief." W.R.A.P. 12.03 declares that proceedings for judicial review shall be instituted by filing a petition for review with the district court. Employee filed a "Notice of Appeal" which did not include such statement.

The statutes in regard to worker's compensation cases adopted by the legislature in 1986 provided that *"appeals"* may be taken from the decisions of a hearing examiner to the district court "as provided by the Wyoming Administrative Procedure Act." Wyo.Stat. § 27–14–602 (1991). The Wyoming Administrative Procedure Act, Wyo. Stat. § 16–3–114 (1990) (emphasis added), provides in pertinent part:

(b) The supreme court's authority to adopt rules governing review from agencies to the district courts shall include authority to determine the content of the record upon review, the pleadings to be filed, the time and manner for filing the pleadings, records and other documents and the extent to which supplemental testimony and evidence may be taken or considered by the district court. The rules adopted by the supreme court un-

der this provision may supersede existing statutory provisions.

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party *and due account shall be taken of the rule of prejudicial error.* The reviewing court shall:

\* \* \* \* \* \*

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion **or otherwise not in accordance with law;**

\* \* \* \* \* \*

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

While employee did not conform to W.R.A.P. 12 in that only a "Notice of Appeal" was filed without a "statement showing jurisdiction and venue and the specific ground or grounds upon which petitioner contends"—and that was error—W.R.A.P. 7.04 sets out that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

An appellant to this court has the burden of establishing that error is prejudicial or injurious and warrants reversal. *Spilman v. State,* 633 P.2d 183 (Wyo.1981). The Division set out no reason here why it was prejudiced or even concluded that it had been prejudiced by the error we acknowledge. The parties were directed by the district court to file briefs, which the Division did. The Division was accorded every right to be heard. We find no prejudice.

We hold that employee has met all the requirements to allow benefits for an employment-related coronary condition and

the award of benefits is supported by substantial evidence.

While we agree with the district court that the conclusion of the hearing examiner is unsupported by substantial evidence appearing in the record of the agency hearing, we are unable to affirm its disposition and must remand to the district court with instructions to follow the concept of *State ex rel. Wyoming Workers' Compensation Division v. Hollister,* 794 P.2d 886 (Wyo. 1990) and remand to the administrative agency.