**MMOE, a/k/a PO, Appellant (Defendant),**

**v.**

**MJE, Appellee (Plaintiff).**

**No. C–91–12.**

Supreme Court of Wyoming.

Nov. 13, 1992.

John M. Daly and Wendy M. Martin, Gillette, for appellant.

Michael A. Maycock of Maycock Law Offices, P.C., Gillette, for appellee.

Jack Sundquist, Gillette, Guardian Ad Litem.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

MACY, Chief Justice.

Appellant MMOE (the mother) appeals from the trial court's denial of her petition for custody of her son due to alleged sexual abuse by Appellee MJE (the father). The lower court found that sufficient evidence did not exist to support the mother's allegations of sexual abuse and ordered that custody of the son remain in the father with supervised visitation rights in the mother.

We affirm.

The mother presents the following issues for our consideration:

I. The District Court erred in its application of WRE 706.

(a) The Court failed to enter an order to show cause why an expert should not be appointed.

(b) The Court failed to inform [the] expert of his duties in writing and to file in writing with the clerk or in the alternative to have [a] conference in which all parties had an opportunity to participate.

(c) The Court's expert failed to follow what written instructions were given by the Court Order.

(d) The Court's expert failed to advise the parties of his findings.

II. The District Court abused its discretion when it found that Dr. Ned Tranel, the court-appointed expert, was qualified to give[ ] an opinion as to whether the minor child ... was sexually abused.

(a) Dr. Tranel did not possess scientific, technical, or other specialized knowledge of child sexual abuse that could assist the trier [of] fact.

(b) Dr. Tranel did not possess the knowledge, skill, experience, training or education to be a qualified expert in the field of child sexual abuse.

(c) The facts and data relied upon by Dr. Tranel in making his conclusions were not of the kind reasonably relied upon by the experts in the field of child sexual abuse in forming opinions or inferences upon the subject.

III. The Court erred in failing to admit the depositions of the San Diego experts pursuant to Rule 32 W.R.C.P.

The mother and the father married in 1982, and their son was born in January 1984. The parties were divorced pursuant to a divorce decree entered on October 16, 1985, and amended on November 17, 1985. The court awarded the primary custody of the son to the mother and extensive visitation rights to the father. In 1988, the mother petitioned the court to suspend or terminate the father's visitation rights because he allegedly sexually abused his son. The father denied the allegation and counterclaimed for custody of the son. Following a two-day trial, the court found that the mother's allegations of sexual abuse were "totally without merit." The court further found that the mother's refusal to accept the fact that her allegations were unfounded damaged the father's relationship with his son and warranted awarding custody of the son to the father. The court's order granted the same visitation schedule to the mother which the father previously enjoyed, including summer vacations.

* Chief Justice at time of oral argument

The son spent the summer of 1990 with his mother but visited his father over the July 21–22 weekend. Upon returning from his weekend visit, the son allegedly complained to his mother that he had been sexually abused by his father and paternal grandmother. In a graphic representation of the alleged abuse, the son drew a picture of his father sodomizing him and his paternal grandmother "putting [a] knife up [his cousin] Ryan's butt." On July 25th, the mother and her son flew to San Diego, California, where Amy Markin, a licensed clinical social worker, and Cynthia Kuelbs, M.D., interviewed and examined the son at the San Diego Children's Hospital and Health Center for possible sexual abuse.

Following her return from San Diego, the mother obtained a temporary restraining order, prohibiting any further contact between the father and the son. The restraining order was supported by the mother's signed affidavit, as well as Amy Markin's unsigned affidavit. On August 14, 1990, the father moved to dissolve the temporary restraining order, in part, because Ms. Markin did not sign her affidavit and because Dr. Kuelbs did not submit an affidavit. The court held a hearing on the father's motion and allowed the restraining order to continue, subject to the conditions that the mother file a petition to modify the father's visitation rights and that she also produce Ms. Markin's and Dr. Kuelbs' signed affidavits by August 29th. The mother filed the motion to modify the father's visitation rights but failed to obtain the required signed affidavits. The mother's failure to obtain the affidavits prompted the court to lift the restraining order on August 31st.

On September 4, 1990, the mother again sought a temporary restraining order. Because of conflicting evidence concerning the alleged abuse, the court denied the mother's request for a temporary restraining order in a hearing held on September 17th. In that same hearing, the court directed that the son be placed in the temporary custody of the Department of Public Assistance and Social Services (n/k/a the Campbell County Department of Family Services); appointed a guardian ad litem for the son; and, of particular significance to this appeal, ordered both parties to undergo rehabilitative counseling with Ned Tranel, Ph.D., a clinical psychologist.

In a subsequent hearing, both parties expressed concern over the lack of clarity in what duties the court expected Dr. Tranel to perform. The judge attempted to alleviate the confusion by stating:

> [T]he child[ ] needs some counseling to try and straighten his life out and to get him on a track that leads to a healthy upbringing. The Court believes that that could best be accomplished by Doctor Ned Tranel. And I have had a lot of confidence in Doctor Ned Tranel. I think it goes without saying that before he can start the rehabilitative efforts that he is going to have to do some type of evaluation. And I guess I didn't clarify that enough. I thought counsel would understand that that was going to be part of the process. However, apparently, there is some confusion. I will see if I can't clarify that so that everybody knows where we are going.
>
> Doctor Tranel certainly would be able to do some evaluations on this child and I believe that he would do those in a controlled setting. And I will also ask that included in that be the interactional assessment.[1] And, also, I will allow counsel to submit to Doctor Tranel, before he starts his work on [the son], their suggestions or recommendations as to any type of testing that they would like to see done by Doctor Tranel on [the son].

Counsel for both parties, as well as the guardian ad litem, had the opportunity to seek additional clarification of Dr. Tranel's role. None of the parties present registered any objection to Dr. Tranel's role, nor did they request that the court limit his duties.

---

1. A method in which the therapist places the child and the alleged perpetrator in the same room and evaluates their interactions.

Dr. Tranel completed his report assessing the parties during the first week of February 1991. The report described the son's behavioral pattern as not being consistent with that of a sexually abused child and concluded that the son's parenting needs would be met most effectively through continued custody with his father. The trial commenced on February 19th and lasted for nineteen days spread out over a three-month period. In those nineteen days, the trial judge heard testimony from over fifty witnesses and examined over five hundred exhibits. After considering the voluminous testimony and exhibits, the trial judge found that the mother failed to prove that a substantial change in the circumstances occurred or that the father sexually abused his son.

I

The mother's first contention is that the district court failed to comply with W.R.E. 706 when it appointed Dr. Tranel. W.R.E. 706(a) provides:

> (a) *Appointment.*—The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

The mother views the lower court's appointment of Dr. Tranel as violating almost every procedural requirement contained in W.R.E. 706. Specifically, the mother claims that the court failed to enter an order to show cause and failed to inform Dr. Tranel of his duties in writing or at a conference in which the parties would have had an opportunity to participate; that, once appointed, Dr. Tranel failed to follow the court's limited instructions; and that the doctor failed to advise the parties of his findings.

■ As a threshold matter, it is not entirely clear whether W.R.E. 706 even applies to this case. Apparently, the trial judge determined in a September 17, 1990, hearing that Dr. Tranel should provide some assistance in this case. The record does not contain a transcript of that hearing, but the court's order stemming from that hearing required both parties to make arrangements for rehabilitative counseling with Dr. Tranel and to follow his recommendations. Thus, it would appear that initially Dr. Tranel's role was merely that of a counselor, not a court-appointed expert. However, as discussed above, the court later clarified its intention to have Dr. Tranel evaluate and perform psychological testing on the son. The court's clarification of Dr. Tranel's intended role leads us to believe that the doctor was a court-appointed expert as contemplated by W.R.E. 706. Consequently, we must consider whether the trial court complied with W.R.E. 706 and whether any failure to comply was sufficiently prejudicial to constitute reversible error.

■ The mother's first claim is that W.R.E. 706(a) required the district court to enter an order to show cause why Dr. Tranel should not be appointed and that no such order was entered. By requiring an order to show cause to be entered, W.R.E. 706(a) clearly contemplates that the parties shall be afforded an opportunity to object to court-appointed experts. 3 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 405 (1979). The lower court did not enter an order to show cause in this case. However, the court did provide both parties, as well as the guardian ad litem, with the same opportunity to object to Dr. Tranel's appointment that a show-cause order would have provided. At

the October 11, 1990, hearing, both parties expressed concern over the scope of Dr. Tranel's role, and the judge clarified the role he intended Dr. Tranel to perform. The mother failed to object to Dr. Tranel's proposed role.

■ It is not certain whether the mother's failure to initially object to Dr. Tranel's appointment constituted a waiver of any future objection. In any event, even if we assume that the mother made a valid objection, the court's failure to enter an order to show cause was harmless error. W.R.A.P. 7.04 (now W.R.A.P. 9.04). As the appellant, the mother has the burden of proving that the failure to enter an order to show cause was so prejudicial as to warrant a reversal. *State ex rel. Wyoming Workers' Compensation Division v. Taffner*, 821 P.2d 103, 107 (Wyo.1991) (citing *Spilman v. State*, 633 P.2d 183 (Wyo.1981)). The only prejudice cited by the mother pertaining to the lack of a show-cause order was her inability to demonstrate why Dr. Tranel should not have been appointed. If the mother had been denied such an opportunity, we would agree. However, the October 11th hearing provided her with ample opportunity to object. We are unable to discern any prejudice to the mother caused by the court's failure to enter a show-cause order, much less sufficient prejudice to warrant a reversal. Although a surprisingly scarce number of opinions discuss the ramifications of a court's failure to comply with the procedural requirements of W.R.E. 706(a), we note that at least one other court which has considered the issue has been flexible in requiring a show-cause order. *Swilling v. Swilling*, 329 N.C. 219, 404 S.E.2d 837 (1991). *See also United States v. Weathers*, 618 F.2d 663, 664 n. 1 (10th Cir.), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980).

■ The mother next contends that the court failed to inform Dr. Tranel of his duties in writing and to file the writing with the clerk or, in the alternative, to have a conference at which all parties would have an opportunity to participate. We disagree. In two separate orders, filed with the clerk, the judge explained Dr. Tranel's role. The first order required the parties to undergo rehabilitative counseling with Dr. Tranel and to follow his recommendations. The second order was entered after the court clarified Dr. Tranel's role in the October 11, 1990, hearing and authorized Dr. Tranel to do evaluations, including interactional assessments in a controlled setting. The order also allowed the parties' attorneys to recommend tests for Dr. Tranel to perform on the son. In our view, the instructions contained in the court's order satisfy W.R.E. 706(a). The instructions were in writing and were filed with the clerk. It is evident from the transcript of the October 11th hearing that Dr. Tranel understood that the court's order would limit his duties.

[MOTHER'S COUNSEL]: Judge, my conversation with Doctor Tranel, I want to disclose that he indicated what he was going to do was evaluate—his plan, at least pending the order of the Court today, was to essentially assess everybody in a cold fashion without looking at all the prior documentation and then he would request the documentation, the tapes and the like as he went along. That indicated, what he indicated the plan unless the Court otherwise ordered, was his plan.

■ To the extent the court's order constituted written instructions, the mother claims that Dr. Tranel went beyond the scope of those instructions by diagnosing the mother and the father and expressing his opinion that their son had not been sexually abused. We have difficulty perceiving how Dr. Tranel could make an informed evaluation of the son unless he also assessed the parents and made some conclusion regarding the existence of sexual abuse. The son's well-being, the mental state of his parents, and the possibility of sexual abuse are all inextricably intertwined. Admittedly, Dr. Tranel's written instructions were not a paradigm of precision and were less explicit than those seen in some other decisions. *See, e.g., Leesona Corporation v. Varta Batteries, Inc.*, 522 F.Supp. 1304, 1311 n. 17 (S.D.N.Y.1981). Nevertheless, we do not think that Dr.

Tranel exceeded the scope of his instructions by diagnosing the parents or concluding that the son had not been sexually abused.

■ In a related argument, the mother claims that Dr. Tranel failed to disclose his findings in a timely manner and, specifically, that he did not reveal in either his deposition or report that he made psychological diagnoses of the parties. Dr. Tranel explained that, in his report, he attempted to be conciliatory and to expedite a settlement concerning custody of the son. Dr. Tranel thought that attaching a psychological label to the parents would carry negative connotations and could possible impede a resolution. Consequently, he did not include his psychological diagnoses of the mother and the father in his report. Regarding the deposition, Dr. Tranel did not think the mother's attorney asked him whether he made psychological diagnoses of the parties, and he felt no duty to volunteer such information. At trial, the mother claimed surprise when Dr. Tranel testified concerning his diagnoses of the parties. The trial court solved the problem by granting an opportunity to the mother's counsel to redepose Dr. Tranel before cross-examining him. Any prejudice to the mother caused by Dr. Tranel's failure to initially disclose his diagnoses was cured by the court's allowing her to depose him a second time.

## II

■ As her second issue, the mother argues that the trial court abused its discretion when it found that Dr. Tranel was qualified to give an opinion on whether the son had been sexually abused. W.R.E. 702 governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

On appeal, we will not disturb the lower court's determination unless it is clearly and prejudicially erroneous or is an abuse of discretion. *Montoya v. State*, 822 P.2d 363, 366 (Wyo.1991); *Caterpillar Tractor Company v. Donahue*, 674 P.2d 1276, 1286 (Wyo.1983). To demonstrate that an abuse of discretion exists, the mother must show that the lower court unreasonably determined that Dr. Tranel was a qualified expert. *Montoya*, 822 P.2d at 366 (citing *Noetzelmann v. State*, 721 P.2d 579 (Wyo. 1986)).

■ The record discloses that Dr. Tranel obtained his Ph.D. from Washington State University in 1960. His first position was a joint appointment as an assistant professor at the University of South Dakota and the director of a child guidance clinic. From 1963 to 1972, he held various positions in the field of psychology, including appointments at the Northern Wyoming Mental Health Center and the Eastern Montana Mental Health Center. Since 1972, Dr. Tranel has been in private practice and involved with the Child Study Center in Billings, Montana. In his private practice, Dr. Tranel receives requests from regional agencies, such as the Department of Family Services, and the school systems to assess children for possible sexual abuse. By his own calculations, Dr. Tranel has assessed well over a thousand children for sexual abuse. He testifies in court approximately once a month concerning allegations of child sexual abuse and has previously testified between ten and twenty times in Wyoming courts as an expert in the field of child sexual abuse. In light of the foregoing, we are persuaded that the trial court acted reasonably in concluding that Dr. Tranel was qualified as an expert in the field of child sexual abuse.

The mother argues not only that Dr. Tranel was not qualified but also that he relied upon facts and data in reaching his opinion which were not of the kind reasonably relied upon by experts in the field of child sexual abuse as required by W.R.E. 703. W.R.E. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or

made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Among the information which Dr. Tranel relied upon to form his opinion were psychological tests which he conducted on the son, assessments of the son interacting with his immediate family, and a large number of reports and data compiled by other professionals involved in the case. The mother primarily objects to Dr. Tranel's inappropriate use of the interactional assessment as a means of determining whether sexual abuse had occurred and his failure to properly score the psychological tests.

■ We acknowledge the mother's right to attack Dr. Tranel's methods as being inappropriate; however, her reliance upon W.R.E. 703 is misplaced. W.R.E. 703 only requires the expert to base his opinion on information reasonably relied upon by experts in the field when the information would be inadmissible as evidence. The second sentence of W.R.E. 703 does not apply to admissible evidence. Richard Neumeg, Annotation, *What Information Is of Type "Reasonably Relied Upon by Experts" Within Rule 703, Federal Rules of Evidence, Permitting Expert Opinion Based on Information Not Admissible in Evidence,* 49 A.L.R.Fed. 363, 367 (1980); *Christophersen v. Allied–Signal Corporation,* 939 F.2d 1106, 1110 n. 4 (5th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). Of the information relied upon by Dr. Tranel, only the reports and information gathered by others would possibly be inadmissible as hearsay. The psychological tests and interactional assessments, both conducted by Dr. Tranel, were admissible evidence and thus not subject to W.R.E. 703's second sentence.

■ Although W.R.E. 703 is an inappropriate mechanism for the mother to utilize to attack Dr. Tranel's use of interactional assessments and his failure to properly score the psychological tests, the mother obviously had other avenues in which to attack the reasonableness of Dr. Tranel's opinion. We said in *Reed v. Hunter,* 663 P.2d 513, 517–18 (Wyo.1983) (emphasis added):

[T]he purpose of the identical counterparts in the Federal Rules of Evidence was not to provide for blanket admissibility of expert opinion testimony. The trial court remains vested with discretion in deciding whether to exclude such testimony because it is deemed unnecessary or not helpful to the trier of the factual issues in reaching an independent conclusion as to the facts. *The adequacy of any foundation for such opinion testimony is subject to scrutiny through cross-examination.*

*See also Weaver v. Mitchell,* 715 P.2d 1361 (Wyo.1986).

The trial court in this case allowed the mother's attorney to redepose Dr. Tranel before cross-examining him because Dr. Tranel had not provided all the pertinent information in his first deposition. After he redeposed Dr. Tranel, the mother's counsel was allowed to exhaustively cross-examine him concerning the reasons for his opinion, including the facts and other matters upon which he based his opinion. The mother's expert witnesses also testified about Dr. Tranel's improper test scoring techniques and the dangers of using the interactional assessment as a mechanism to detect the presence of sexual abuse. The weight and probative values to be accorded to Dr. Tranel's opinion were matters for the trier of fact. *Mealey v. City of Laramie,* 472 P.2d 787, 793 (Wyo.1970), *appeal after remand,* 485 P.2d 1019, *appeal dismissed,* 404 U.S. 931, 92 S.Ct. 282, 30 L.Ed.2d 245 (1971). As the trier of fact, the judge would be free to disregard Dr. Tranel's opinion if he found it were unreasonable or had inadequate factual support. *Krause v. State ex rel. Wyoming Workers' Compensation Division,* 803 P.2d 81, 83 (Wyo.1990). Essentially, the existence of sexual abuse and the method of determining whether the son had been sexually abused became a battle between experts, and the trier of fact simply found that Dr. Tranel's testimony was more convincing.

## III

In her final issue, the mother asserts that the district court erred by not admitting the depositions of Ms. Markin and Dr. Kuelbs. As mentioned earlier, Ms. Markin and Dr. Kuelbs interviewed and examined the son in San Diego for possible sexual abuse. Both Dr. Kuelbs and Ms. Markin prepared written reports of their findings, and Ms. Markin also videotaped her interviews with the son. Relying upon information obtained by Ms. Markin and Dr. Kuelbs, the mother procured a temporary restraining order against the father. In an effort to acquire information to be used to dissolve the temporary restraining order, the father's attorney deposed both experts. He fully deposed Ms. Markin but, before he finished deposing Dr. Kuelbs, the court lifted its temporary restraining order against the father. Since the objective of deposing the San Diego experts had been accomplished, i.e., the temporary restraining order was dissolved, the father's counsel did not depose Dr. Kuelbs any further. To protect the parties' confidentiality, a California court entered an order which required the deposition transcripts to remain under seal and prohibited them from becoming part of the court record. This order was later amended to keep the depositions under seal if they were placed in public records and did not prevent the depositions from becoming part of the record.

The mother's counsel subsequently attempted to have Ms. Markin and Dr. Kuelbs testify at trial, but neither of them was willing to come to Wyoming to testify. Her counsel then requested the California court, through letters rogatory, to direct the experts to give trial testimony via teleconference. The California court denied this request. As a substitute for live testimony, the mother offered into evidence Ms. Markin's and Dr. Kuelbs' depositions, reports, and videotape. The father objected to admission of the depositions because they were incomplete and he would have no opportunity to cross-examine the witnesses. In his ruling, the trial judge said:

Well, I guess in this case I am inclined to agree with [the father's counsel], since that deposition was not completed for whatever purpose out there, there is no way that the person can be cross-examined. And given the ruling by the Court in California, I am going to not allow the use of the Markin or Kuelbs depositions in court.

The court admitted the reports and videotape into evidence.

On appeal, the mother claims that the trial court's failure to admit the depositions was contrary to W.R.C.P. 32(a)(3)(B) and (D)[2], which provided:

(a) *Use of depositions.*—At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

. . . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (B) that the witness is absent from the county where the trial or hearing is held, unless it appears that the absence of the witness was procured by the party offering the deposition; or ... (D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena....

Although the circumstances of this case comported with W.R.C.P. 32(a)(3)(B) and (D), the trial court was not required to automatically admit the San Diego experts' deposition testimony. Rulings on the admission of evidence are within the sound discretion of the trial court. *L.U. Sheep Company v. Board of County Commissioners of County of Hot Springs*, 790 P.2d 663, 673 (Wyo.1990). That rule is no less applicable to the admission of depositions. *Waggoner v. General Motors Cor-*

**2.** Revised effective March 24, 1992.

*poration,* 771 P.2d 1195 (Wyo.1989); *Reilly v. Reilly,* 671 P.2d 330 (Wyo.1983).

■ The court had a twofold rationale for denying admission of the San Diego experts' depositions. First, it was concerned with the California court's order limiting the depositions' use, and, second, the father had not fully deposed the witnesses and could not cross-examine them at trial. We appreciate the court's concern for the father's right to cross-examine the witnesses; however, that was not a sufficient reason to deny admission in this case. The father's claim that he did not finish deposing the witnesses applied only to Dr. Kuelbs' deposition, not to Ms. Markin's deposition. More importantly, the father could have completed Dr. Kuelbs' deposition if he had chosen to do so. This was not a situation where the deponent died during the deposition, leaving a party with no adequate opportunity to cross-examine. *See* 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2146 (1970). The father maintains that his failure to complete the depositions was justified because they were taken to dissolve the temporary restraining order, not in anticipation of the custody trial. Nevertheless, the father should have realized that the depositions might be used in the ensuing custody litigation. The depositions were taken at the end of August, more than a week after the mother filed her petition to terminate the father's visitation rights.

In addition to the father's right to cross-examine, the court was also concerned with the California court's order restricting the depositions' use. The California court's order, as amended, limited the depositions' use to the Campbell County proceeding and required that the depositions would be sealed if they were placed in public records. We cannot find anything in the California court's order to prevent a Wyoming court from admitting the deposition testimony into evidence.

■ Although we do not think either of the court's proffered reasons for denying admission of the depositions was correct, the error was harmless. The mother claims that, without the deposition testimony, the finder of fact could ignore and not fully understand the logical reasoning and impact of both reports' findings. Specifically, she argues that (1) Dr. Kuelbs' deposition could have clarified confusion over whether pictures taken of the son's rectum while he was in San Diego and later introduced at trial were originals or duplicates; (2) Dr. Kuelbs' deposition could have explained the term "venous congestion" as used in her report and why it was significant; and (3) Ms. Markin's deposition could have helped rebut the father's allegation that the mother coached her son regarding his responses and body language in the videotape.

We address the mother's claims in order. First, it is not apparent how Dr. Kuelbs' deposition testimony was necessary to clarify which pictures were used at trial or how the mother was prejudiced. At trial, the father's witness who rebutted Dr. Kuelbs' conclusions testified that he relied upon the original photographs to form his opinion and that he used the duplicates introduced at trial only to refresh his memory. As to the mother's second claim, two doctors explained that "venous congestion" is anything in the rectal area which impedes venous flow to the heart. Both doctors explained that venous congestion may result from sexual abuse as well as from other less insidious origins. Thus, the trier of fact was certainly made aware that Dr. Kuelbs' finding of venous congestion in the son could signify sexual abuse. Finally, two experts for the mother testified regarding Ms. Markin's interview with the son. One of those experts explained that, in his opinion, Ms. Markin's interview did not reveal any significant evidence of maternal coaching or indoctrination. We do not think the lack of one more witness on possible maternal coaching prejudiced the mother.

To conclude, this was a highly emotional, complex trial with sufficient credible evidence to support a decision in favor of either party. Our role in reviewing this case was to address the legal issues raised by the mother, not to draw our own conclu-

sions from a cold record regarding the existence of abuse. No trial is perfect, and, as the mother has pointed out, this trial was no exception. However, after nineteen days of trial, over fifty witnesses, and over five hundred exhibits, the trial court should be commended for the manner in which it conducted the trial. Of the procedural errors which were committed, none was sufficiently egregious to warrant reversal.

Affirmed.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

I do not agree with either the legal decision or the factual resolution provided in this court's decision. In this contended child abuse saga, I find the risk of misconduct against the small child to totally outweigh parental claims based on the kind of evidence provided here.

I would conclude that the Billings, Montana forensic expert was clearly unqualified to provide the character of evidence sufficient to resolve contested custody for retention by the father. Although this court should not embark on a weighing process of trial evidence, the validity and value for significant decision making in what the forensic expert provided in testimony is surely in question. No realistic view of the evidence can be obtained that the expert either had a relevant knowledgeable basis to use asserted normality to prove that sexual abuse of the child had not occurred or, unfortunately, that it will not conceivably occur or reoccur in the future. We are faced with the compelling concern of modern litigation, questioning that when a claimed expert says something, his statement does not necessarily make it factually valid. This is particularly true if a relevant factual basis and some determined reliable scientific theory is absent. *Cf. Scadden v. State*, 732 P.2d 1036 (Wyo.1987).

The cottage or corporate affiliate industry is developing as an appendage to the American trial system in both criminal and civil cases. This is the forensic expert who provides testimony directed to reduce the burden of fact finder decision making. If the expert is truly qualified, the subject is proper, the conclusions adequately confined, and the testimony factually valid and properly based on requisite standards of analysis, there is nothing wrong with the system. If any criteria fails, justice may be overlooked or lost.

In *Stephens v. State*, 774 P.2d 60 (Wyo. 1989), this court corrected the mistake we made in admission of a child abuse expert's opinion in *Brown v. State*, 736 P.2d 1110 (Wyo.1987), Urbigkit, J., dissenting. Unfortunately, this present case now anticipates a return to the *Brown* expert witness of guilt or, here, non-guilt of one and guilt of the other. *See Smith v. State*, 564 P.2d 1194 (Wyo.1977). Unfortunately here, we have a converse which is even more troubling. This expert asserts absence of abuse by normality under a circumstance where the child has not seen normality for at least two years prior to the date of the clinical consideration. The decision is made without application of any objective standard used to define what, in conduct, demonstrates that abuse has occurred or, conversely, why something must be shown or otherwise abuse is disproved. This testimony essentially establishes, as his view, that the mother was guilty and the father was innocent because, as a neuro-psychological specialist, he found no behavior or pattern consistent with abuse. The real question, in conflict, is whether asserted normality necessarily denies occurrence in converse analysis where observed abnormality may demonstrate objective facts. The testimony given was as subjective as is possible for testimony to be. *Price v. State*, 807 P.2d 909 (Wyo.1991). *Cf. Zabel v. State*, 765 P.2d 357 (Wyo.1988).

In this case, with other comprehensive evidence available, I do not find the Billings forensic expert qualified to give the valid opinion evidence justifying custodial retention of the child by his father. Likewise, I find the expert's conclusions supported by nothing but rank supposition, *Stephens*, 774 P.2d 60, totally different from the more qualified consideration which had been given by others certainly more balanced and qualified by experience

and demonstrated by objective standard testimony. What is provided here approaches the unsatisfactory level of testimony we considered in *Schmunk v. State*, 714 P.2d 724 (Wyo.1986).

Furthermore, there is nothing about the rejection of the deposition taken by the California experts which justifies exclusion except, unfortunately, a result that, when a child's well-being is at stake, the evidence is limited to a one-sided view. Admission of valid, persuasive and definitive evidence by a party is intrinsic to the constitutional right to justice and not confined by happenstance discretion. *Stauffer Chemical Co. v. Curry*, 778 P.2d 1083 (Wyo.1989); *Kobos By and Through Kobos v. Everts*, 768 P.2d 534 (Wyo.1989).

> A party should be allowed an appropriate opportunity to present and develop that evidence relevant to that party's theory of the case. Such evidence certainly can include the offering, direct examination, and cross-examination of expert witnesses, under appropriate circumstances, assuming that the testimony of the experts will properly assist the trier of fact.

*Stauffer Chemical Co.*, 778 P.2d at 1098. *See also Hall v. Hall*, 708 P.2d 416 (Wyo. 1985).

Under no circumstance was the evidence cumulative where directly relating to the contradictory "expert" conclusion rendered by the Billings forensic expert witness. Technical concepts to exclude relevant evidence like discretion and harmless error hardly suffice in an expert witness-driven decision like this. *Coronado Oil Co. v. Grieves*, 642 P.2d 423 (Wyo.1982). This should be particularly true where the safety and well-being of a small child is involved.

This case has provided no evidence that the mother is unqualified to have general custody. The only basis now used for denial is her consuming belief and consequent litigative assertions that the father is a sexual abuser. When we expend technical rules to permit the alleged expert to say what he did and confine evidence in contradiction tendered by the mother, a terribly

fundamental question remains: What if the mother is right?

I respectfully dissent.